595 N.W.2d 511 (1999)
STATE of Minnesota, Respondent,
v.
James Diandre PILOT, Appellant.
No. C5-97-858.
Supreme Court of Minnesota.
June 3, 1999.
*512 John M. Stuart, State Public Defender, Scott G. Swanson, Assistant State Public Defender, Minneapolis, for appellant.
Michael A. Hatch, State Attorney General, Saint Paul, Amy J. Klobuchar, Hennepin County Attorney, Linda Freyer, Assistant *513 County Attorney, Minneapolis, for respondent.
Heard, considered, and decided by the court en banc.

OPINION
STRINGER, J.
James Diandre Pilot seeks review of a court of appeals decision affirming a jury verdict finding him guilty of attempted first-degree murder, attempted first-degree murder while committing criminal sexual assault, and first-degree criminal sexual assault. Pilot argues that he should be granted a new trial because the prosecutor committed prejudicial misconduct in his cross-examination of Pilot by repeatedly asking Pilot to characterize the state's witnesses as lying in their testimony. Pilot also argues that: (1) the state presented insufficient evidence to support the jury's first-degree criminal sexual conduct verdict, (2) items seized from Pilot's apartment should not have been admitted in evidence because the warrant authorizing the search was not supported by probable cause, and (3) the prosecutor committed prejudicial misconduct by failing to turn over semen evidence taken from the victim after her attack and hospital records concerning the victim's post-attack physical therapy. We affirm.
Sometime between 4:00 a.m. and 4:30 a.m. on May 11, 1996, 22-year-old H.T. was raped and beaten in her Hopkins townhouse while her two-year-old child slept on a nearby couch. At approximately 4:30 a.m., H.T.'s neighbor was awakened by loud noises coming from H.T.'s two-level townhouse. She heard H.T. crying out from the upstairs level of the townhouse for someone to get off her and "[p]lease don't do this." Then the neighbor heard repeated thumping noises coming from the upstairs level of the townhouse. The neighbor immediately called 911, and while waiting for the police, she heard thumping noises from the downstairs level.
Hopkins police officers Stroner and Neff were dispatched to H.T.'s townhouse at 4:32 a.m. and arrived within minutes. They checked the patio door at the back of the townhouse and noting nothing unusual, proceeded around to the front. Although the front door was locked, the officers heard repeated thumping noises coming from inside. The thumping noises stopped immediately when the officers knocked on the front door. After knocking on the front door several more times, each time identifying themselves as police officers and receiving no response, Stroner ran to the back of the townhouse where he observed that the patio door was now open and that the inside screen door had been pushed out. He saw an African-American male approximately 30-40 yards from the back of the townhouse wearing dark clothing. Stroner identified himself as a police officer and directed the man to stop, but he disappeared around the corner of a nearby complex of townhouses. Stroner gave chase but was unable to locate him.
When Stroner and Neff then entered H.T.'s townhouse through the broken patio door, they discovered H.T. lying on the floor of the lower level of the townhouse next to the stairs. She lay curled up in a fetal position, legs pulled up under her, in a pool of blood. A pair of black stretch pants was tied tightly around her neck and she was not breathing but she began to breathe intermittently after Stroner and Neff removed the stretch pants and administered oxygen. On the same level they found H.T.'s child asleep on a couch. H.T. was transported by ambulance to the emergency room of the Hennepin County Medical Center (HCMC) where she remained in a coma and on a ventilator for the next five days.
Later in the morning of H.T.'s assault, Investigators Gordon Klingbeil and Jeanne Sutich visited H.T.'s family members and asked if they knew of anyone who might be a potential suspect. H.T.'s mother and sister informed the investigators that H.T. *514 was very safety conscious and would never let a stranger into her townhouse and gave the investigators H.T.'s address book and a list of H.T.'s friends and acquaintances. The investigators informed H.T.'s family members that Officer Stroner had seen an African-American male in the vicinity of H.T.'s townhouse immediately after the attack. A few hours later, H.T.'s family members thought of Pilot, who is African-American and was the live-in boyfriend of K.M., H.T.'s best friend. The family members told the investigators that H.T. had initially refused to let Pilot into her apartment when he had unexpectedly arrived at H.T.'s door in the middle of the night in December of 1995 and when she did admit him he made sexually suggestive comments to her.
Later that afternoon Klingbeil and Sutich spoke with K.M. at the apartment she and Pilot shared. Pilot was not at home. K.M. told the investigators what she believed to be the truth that Pilot had been at work at the time H.T. was attacked. She described the black jeans, tennis shoes, and black, green, and white nylon jacket Pilot had been wearing when he returned home on May 11. The jacket she described lay on a table near where the investigators were sitting and the tennis shoes were on the floor near the table. Klingbeil lifted up the corner of the jacket with a pen to examine it but noticed nothing unusual. He turned the tennis shoes over and examined the soles, again noticing nothing unusual.
The investigators learned that Pilot had not gone to work on the night of May 10 and in fact had not been at work all week. Pilot later confirmed this to Sutich, telling her that he had gone to a party and then to his friend Greg Lynn's house. Pilot admitted to drinking alcohol at the party. Chris Gardner, a friend of Pilot's who had been interviewed prior to trial, told police that Pilot had also smoked marijuana at the party. Greg Lynn testified that he and Pilot smoked some marijuana at Lynn's house. Pilot claims he did not smoke marijuana that night.
The next day, May 12, 1996, Klingbeil and Sutich went to Pilot's and K.M.'s apartment and arrested him on an outstanding misdemeanor warrant unrelated to the H.T. attack. Police then contacted K.M. and received her verbal consent to search the apartment she and Pilot shared. The police also obtained a warrant authorizing the search of the apartment for a pair of black jeans, a black, green, and white jacket, a pair of tennis shoes, and a pair of lug-soled boots. All of the items listed in the search warrant were seized. During the search, Sutich noticed blood on the jacket, the same jacket she and Klingbeil had seen when they first visited K.M.'s at the apartment on May 11. Blood was later found on the black jeans and on one tennis shoe as well.
The amount of blood found on the tennis shoe was too small for analysis but the jacket and jeans had sufficient blood stains for genetic marker tests which indicated consistency with H.T.'s genetic markers, but not with the genetic markers of either Pilot or K.M. The DNA profile of the blood found on the jacket matched H.T.'s DNA profile. Analysis of blood spatter patterns performed on the jacket and jeans was consistent with the blood spatter patterns at the H.T. crime scenean impact spatter from an object striking a source of blood and the blood then projecting off from that source onto the jeans. The blood spatter pattern on the jacket was a hair swipe, a pattern created when bloody hair strikes a surface.
When H.T. regained consciousness a week after the crime, her father heard her identify Pilot as her assailant. She later told her attending physician on May 19 that she hoped James knew what he had done to her and again identified Pilot as her attacker when police interviewed her on May 21.
At trial H.T. recounted what happened to her in the early morning hours of May 11, 1996. She testified that she was awakened *515 at approximately 4:00 a.m. by someone knocking on her front door. Pilot was at the door. He asked to use H.T.'s telephone because he could not locate K.M. and their infant son. H.T. unlocked the inside screen door and asked Pilot to wait at the front door while she brought the telephone to him because her daughter was sleeping on the couch and she did not want him to disturb her. Pilot did not wait at the door, however. He entered the apartment, put on a pair of black gloves, and proceeded to rape H.T., then beat her head against a tile floor and strangle her until she lost consciousness.
Pilot contended at trial that the time-frame in which the attack occurred demonstrated he could not have been H.T.'s assailant. He argued that it would have been impossible for him to make a telephone call at 4:00 a.m. from the home of his friend in Brooklyn Park, drive to H.T.'s townhouse in Hopkins, attack her, then flee the scene before the police arrived sometime around 4:35 a.m. Police confirmed that Pilot placed a call to Patty Rabago, a friend of Pilot's, at approximately 4:00 a.m. and that the call originated from a Brooklyn Park prefix. Rabago's testimony confirmed that Pilot had called her on May 11 and that Pilot repeatedly asked, or begged, to permit him to come over to Rabago's apartment. Rabago refused to give Pilot directions to her house, finally hanging up on him. Pilot's friend Greg Lynn testified that he lived in Brooklyn Park, that Pilot had been at his house on May 11, and that the two of them went out to get some food at approximately 1:30 a.m., then returned to Lynn's house and watched a movie. After the movie ended, Pilot made a telephone call that Lynn recalled as lasting anywhere from 15-25 minutes, then left. Police estimated that H.T.'s townhouse was a 15-20 minute drive from Lynn's house.
During the course of trial the defense learned that police had found possible seminal fluid on two of the sets of swabs from the rape kit used on H.T. One set, analyzed at the Bureau of Criminal Apprehension, tested negative for seminal fluid, but the other set, analyzed at the HCMC lab, tested positive but no DNA could be retrieved from the seminal fluid.
Pilot's theory of his defense was that the state's witnesses were lying or mistaken in their testimony and that the police had fabricated evidence. During trial Pilot's counsel questioned him about whether other witnesses were truthful in their testimony and Pilot himself stated that blood evidence had "just popped up" on his shoes and clothing. This theme was reiterated during closing arguments when Pilot's counsel argued:
And they lied about it. They lied about it. They didn't come here and present this evidence fairly for you to just make your own decision, let the chips fall where they may. They lied. They lied.
The jury found Pilot guilty of attempted first-degree murder, attempted first-degree murder while committing criminal sexual conduct, and first-degree criminal sexual conduct. On appeal to the court of appeals, he claimed that the prosecutor committed prejudicial misconduct when he asked Pilot to characterize the testimony of some of the state's witnesses as lying. He also argued that the warrant obtained to search Pilot's apartment was not supported by probable cause, and that the prosecutor committed prejudicial misconduct by failing to turn over a report regarding seminal fluid taken from H.T. and hospital records regarding H.T.'s post-attack physical therapy.
The court of appeals affirmed the conviction, concluding that while this court has not addressed the issue of whether "were they lying" questions are appropriate when the defendant has not initiated the line of questioning, it need not decide the issue because if there was misconduct it was harmless beyond a reasonable doubt. The court also rejected Pilot's other claims of error.
*516 Pilot makes the same arguments on appeal here but in addition, he argues for the first time that the state presented insufficient evidence to support his conviction for first-degree criminal sexual conduct.

I.
Pilot first contends that the prosecutor committed misconduct in his cross-examination of Pilot by asking him on several occasions whether certain of the state's witnesses were lying in their testimony. The general concern about "were they lying" questions[1] is that asking one witness to express an opinion as to the veracity of another witness calls for improper comment on another witness' testimony, and that it is the province of the jury to determine the credibility of witnesses. See State v. Casteneda-Perez, 61 Wash.App. 354, 810 P.2d 74, 78-79 (1991). Further, it is perceived as unfairly giving the jury the impressions that in order to acquit, they must determine that witnesses whose testimony is at odds with the testimony of the defendant are lying. See id.
The history of "were they lying" questions in the Minnesota courts leads to no clear conclusions as their propriety. We have suggested in prior caselaw that it may be improper for a prosecutor to ask a defendant on cross-examination whether the state's witnesses were lying, but have made no definitive ruling. See State v. Gaitan, 536 N.W.2d 11 (Minn.1995); State v. Logan, 535 N.W.2d 320 (Minn.1995) State v. Sutherlin, 396 N.W.2d 238 (Minn.1986). In Sutherlin, the prosecutor asked the defendant a number of questions concerning the truthfulness of the state's witnesses, including whether he "felt that all of the people had conspired to come into court and lie." The district court sustained an objection. See Sutherlin, 396 N.W.2d at 241. In affirming the conviction, we stated that "the [district] court presumably would have sustained objections to other questions that were argumentative in nature if defense counsel had objected" but we did not specifically address the "were they lying" question. See id.
In Logan, the defendant argued in his brief to the court the impropriety of these types of questions. We did not address the issue directly but in dicta we stated, "[t]he prosecutor is directed not to engage again in the kind of improper cross-examination of defendant that the state's attorney on appeal conceded was improper," without identifying the "were they lying" questions as the "improper cross-examination" at issue. See Logan, 535 N.W.2d at 325.
In Gaitan, a decision released only two weeks after Logan, the defendant argued that it was improper for the prosecutor to ask him whether witnesses whose testimony contradicted his testimony were lying. Gaitan, 536 N.W.2d at 17. He also argued that the prosecutor asked him two other improper questions on cross-examination and that the prosecutor made improper statements during closing argument. Id. We dismissed all of the claims with the observation that "the prosecutor's conduct in this case was not above reproach" but without specifying what conduct was not above reproach. See id.
Thus, while it is certainly fair to conclude that, in general, this court views with concern the propriety of "were they lying" questions, we have neither set forth a firm rule nor identified under what circumstances, if any, such questions would be permissible.[2]
*517 Courts in other jurisdictions have taken widely different approaches. Some, without providing for or discussing exceptions, broadly hold that "were they lying" questions are improper. Scott v. United States, 619 A.2d 917, 924-25 (D.C.1993) (stating "[w]e have repeatedly condemned questioning by counsel which prompts one witness to suggest that he or she is telling the truth and that contrary witnesses are lying."); United States v. Richter, 826 F.2d 206, 208 (2d Cir.1987) (stating "[p]rosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper"); Casteneda-Perez, 810 P.2d at 79 (stating that the prosecutor's use of "were they lying" questions during cross-examination of defendant invaded the province of the jury and was misleading and unfair in that the practice made it appear that acquittal required the jury to conclude that police officers lied and failed to account for the fact that testimony could have differed even though witnesses were all endeavoring in good faith to tell the truth); State v. Flanagan, 111 N.M. 93, 801 P.2d 675, 679 (Ct.App.1990) (imposing a strict prohibition upon asking a defendant whether another witness was mistaken or was lying); see also United States v. Akitoye, 923 F.2d 221 (1st Cir.1991) (recognizing that "were they lying" questions are improper).
A more permissive approach was taken in People v. Overlee, 236 A.D.2d 133, 666 N.Y.S.2d 572 (N.Y.App.Div.1997), where the court held that "were they lying" questions are not always improper, entrusting to the trial court discretion to determine the propriety of such questions. In Overlee, when defense counsel asked defendant to explain the discrepancies between his own testimony and the testimony of a police officer, defendant responded: "Officer Santana is a liar." Id. at 575. Shortly thereafter, on cross-examination and again on re-cross, the prosecutor asked the defendant whether it was in fact his position that the officer was lying. Id. at 575-76. On appellate review the court recognized that when the defendant himself places the credibility of other witnesses at issue, the prosecutor "need not tread lightly in cross-examining him or arguing his case to the jury." Id. at 575. The court drew the line between permissible cross-examination and prosecutorial misconduct by stating:
In a situation where a defendant flatly denies the occurrence of events and his involvement in those events, as testified to by the People's witnesses in circumstances that exclude the possibility that the prosecution's witnesses may have been mistaken or testified to events based on assumptions or a faulty memory, the defendant has created a credibility contest. Under our adversarial system, the just resolution of competing factual claims, which turn on issues of credibility, depends, in large measure, on the testing for truth. * * * [I]n circumstances where, as here, defendant was the first to inject the word "liar" into the trial, he ought not be heard to complain when the prosecutor also utilizes such terminology.
Id. at 577 (citation omitted). Thus the court left the door open for this kind of cross-examination where the defendant initiates the "credibility contest" and the question presumably has some probative value in the search for truth.

II.
In the present case, the prosecutor asked Pilot to comment on the veracity of three of the state's witnesses: Investigator *518 Sutich, Patty Rabago, and H.T. In addition, the prosecutor questioned Pilot about the truthfulness of Chris Gardner. Defense counsel made no objection. Absent proper objection, we will consider the propriety of the questions on review only if the prosecutor's questions constituted plain error affecting substantial rights. Rairdon v. State, 557 N.W.2d 318, 323 (Minn.1996); see also Minn. R.Crim. P. 31.02. To meet the three-prong plain error test "there must be: (1) error; (2) that is plain; and (3) the error must affect substantial rights." State v. Griller, 583 N.W.2d 736, 740 (Minn.1998) (citing Johnson v. United States, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). This is a standard with a high threshold of persuasion:
the trial error must have been so clear under applicable law at the time of conviction, and so prejudicial to the defendant's right to a fair trial, that the defendant's failure to object-and thereby present the trial court with an opportunity to avoid prejudice-should not forfeit his right to a remedy.
Rairdon, 557 N.W.2d at 323; see also Griller, 583 N.W.2d at 740-41; Minn. R.Crim. P. 31.02. Only if all three prongs are satisfied will the court "address the error to ensure fairness and the integrity of the judicial proceedings." Griller, 583 N.W.2d at 740.
As a general rule, "were they lying" questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence. See Casteneda-Perez, 810 P.2d at 78-79. We emphasize, however, that we have not adopted a blanket rule of law that under no circumstances is a "were they lying" question to a witness on cross-examination proper and we do not believe an inflexible rule prohibiting such questions is necessary or desirable. Situations may arise where "were they lying" questions may have a probative value in clarifying a particular line of testimony, in evaluating the credibility of a witness claiming that everyone but the witness lied or, as in Overlee, the witness "flatly denies the occurrence of events."
Here, the focus of the defense was that the state's witnesses were lying and that the evidence against him was fabricated as part of a vast conspiracy to convict him of a crime he did not commit. From seeking disclosure of the records of the police officers who searched Pilot's apartment to questioning Pilot regarding the truthfulness of the state's witnesses to the propriety of the state's blood evidence and to closing arguments, where Pilot's theory was that the police and the state's witnesses "lied about it," the defense held the issue of the credibility of the state's witnesses in central focus. Further, and perhaps in recognition that the door had been opened, defense counsel did not object to any of the "were they lying" questions posed to Pilot by the prosecutor during cross-examination. Under the circumstances here the prosecutor's "were they lying" questions could well have assisted the jury in weighing Pilot's own veracity and in evaluating his conspiracy theory. We therefore conclude that it was not error for the prosecutor to pose "were they lying" questions to Pilot on cross-examination. Failure to meet the first prong of our plain error analysis requiring proof of "error," obviates the need to address the remaining plain error factors.

II.
Turning to Pilot's supplemental brief, he contends first that the state presented insufficient evidence to support the jury's guilty verdict on the first-degree criminal sexual conduct charge. Second, he claims that the warrant police obtained authorizing the search of Pilot's apartment was not supported by probable cause and that therefore the evidence gathered in the search should not have been introduced in evidence at trial. Third, Pilot claims that *519 the prosecutor committed prejudicial misconduct by failing to provide him with a report containing information regarding seminal fluid from H.T. and by failing to provide Pilot with hospital records of H.T.'s physical therapy until the start of trial.

Sufficiency of the Evidence
Pilot challenges the sufficiency of the evidence as to the first-degree criminal sexual conduct conviction but not as to the attempted first-degree murder and attempted first-degree murder while committing criminal sexual conduct charges. Even though Pilot did not contest the sufficiency of the evidence on appeal to the court of appeals, we will address the issue in order to lay it to rest. In reviewing sufficiency of the evidence we carefully examine the evidence presented in the record, along with legitimate inferences from that evidence, to determine whether the jury could have concluded that the state met its burden of proving beyond a reasonable doubt that the defendant was guilty of each of the charged offenses. State v. Moore, 481 N.W.2d 355, 360 (Minn.1992). Our review is in the light most favorable to the jury's verdict and we assume that the jury believed the state's witnesses and disbelieved evidence contradicting those witnesses. Dale v. State, 535 N.W.2d 619, 623 (Minn.1995); see also State v. Merrill, 274 N.W.2d 99, 111 (Minn.1978).
Pilot was convicted of first-degree criminal sexual conduct defined as engaging in sexual penetration with another person by force or coercion causing personal injury. See Minn.Stat. § 609.342, subd. 1(e)(i) (1998). The evidence of Pilot's guilt was substantial: Pilot's early efforts to engage H.T. in sexual conduct and his effort on the night of the assault to persuade Rabago to let him come over surely identify him as a strong suspect. H.T. positively identified him as her assailant upon waking from her coma and at trial and she had no motive to lie about her best friend's boyfriend. DNA matching that of H.T. was found on the jeans and jacket Pilot had been wearing on the night of the assault and Pilot's alibi as to his whereabouts during the assault clearly left room for a jury to believe that he did in fact have time to attack H.T. The jury could reasonably have reached a verdict of guilty on the basis of this evidence and therefore we hold that the evidence was sufficient to support the jury's guilty verdict on the first-degree criminal sexual conduct charge.

Propriety of Search Warrant
Pilot claims the warrant issued for the search of his apartment was not supported by probable cause and therefore the evidence gathered in the search must be suppressed. When a search is conducted pursuant to consent however, neither probable cause nor a warrant is required. See State v. Hanley, 363 N.W.2d 735, 738 (Minn.1985). Consent need not come from the defendant but may be given by another party who possesses "`common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" Id. (emphasis deleted) (citing United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). At trial, K.M., who was H.T.'s best friend and Pilot's roommate at the time the search was conducted, acknowledged that she gave consent to the search. Where consent to search a dwelling from a person possessing common authority over the dwelling is obtained, a search warrant is not needed. Accordingly, we hold that the police were legally authorized to search Pilot's apartment.

Prosecutorial Misconduct in Withholding Evidence
Finally, Pilot claims that the prosecutor committed prejudicial misconduct by failing to provide Pilot with a report regarding seminal fluid taken from H.T. after the attack and failing to provide Pilot with from 500 to 600 pages of hospital records of H.T.'s physical therapy after the assault. The decision to grant a new trial because of prosecutorial misconduct *520 rests within the district court's discretion and will be reversed only where the misconduct, in light of the entire record, appears to be so inexcusable and prejudicial that the defendant's right to a fair trial was denied. State v. Wahlberg, 296 N.W.2d 408, 420 (Minn.1980).
As to the report regarding seminal fluid taken from H.T. after the assault, the record does not reveal when the prosecutor received the report or whether the report was turned over to the defense in a timely manner. The prosecutor contends that he did turn over the report and that, even if he did not, no prejudice can be asserted because the report was non-exculpatory. As to the hospital records containing information about H.T.'s physical therapy, the district court concluded that the information contained in the hospital records was irrelevant to Pilot's case, but nevertheless granted him a half-day recess to review the records. The records were never introduced at trial. In light of the other overwhelming evidence of Pilot's guilt, the failure to turn over a report containing information about unidentifiable seminal fluid and hospital records containing no exculpatory information was clearly not prejudicial.
Affirmed.
PAGE, Justice (concurring).
I would affirm Pilot's conviction. However, I believe the court is wrong in concluding that the prosecutor's "were they lying" questions did not constitute prosecutorial misconduct. Given the nature of "were they lying" questions, I would hold that such questions are never proper and the answers to such questions are never relevant. Nonetheless, I would affirm Pilot's conviction because on the record before us, the conviction was surely unattributable to the misconduct.[1]
NOTES
[1] "Were they lying" questions, in general, are questions the state poses to a criminal defendant on cross-examination. Typically, the prosecutor will first ask the defendant if he heard the testimony of one or more of the state's witnesses. Then the prosecutor will ask the defendant if the witnesses' testimony was accurate. If the defendant states that the witnesses' testimony was not accurate, the prosecutor will ask the defendant to comment on the veracity of the witnesses' testimony by asking the defendant, "Were they lying?"
[2] We also note that in at least two rulings subsequent to Logan the court of appeals held that posing "were they lying" questions to a defendant on cross-examination may be permissible. See State v. McDaniel, 534 N.W.2d 290 (Minn.App.1995); State v. Wallat, 1997 WL 193914, No. C1-96-1186 (unpub.) (Minn.App. Apr. 22, 1997) (quoting State v. Morgan, 235 Minn. 388, 392, 51 N.W.2d 61, 63 (1952)) (stating "[i]n view of the sharp conflict of the testimony on the principal issue, we feel that the court should permit extreme liberality on cross-examination * * * since it is undoubtedly through this method only that the jury can properly determine where the truth is"). In neither of these cases did the court of appeals reference Logan.
[1] State v. Juarez, 572 N.W.2d 286, 291 (Minn.1997).