ROBERTS, J.,
for the Court.
SUMMARY OF THE CASE
¶ 1. A jury sitting before the Madison County Circuit Court found Feriando Esco guilty of (1) aggravated assault, (2) armed robbery, (3) conspiracy to commit aggravated assault, (4) conspiracy to commit armed robbery, (5) possession of a firearm by a prior convicted felon, and (6) felony evasion. The circuit court sentenced Esco as a habitual offender to five concurrent life sentences and one consecutive life sentence.
¶ 2. Aggrieved, Esco appeals and claims the circuit court erred: (1) in allowing the prosecution to submit the entire guilty plea colloquy of a co-defendant; (2) in failing to give a sua sponte limiting instruction regarding the co-defendant’s guilty plea; (3) in allowing the prosecution to submit evidence of a prior conviction; (4) in allowing the prosecution to ask him, during cross-examination, whether several law enforcement officers had lied when they testified; (5) in allowing law enforcement officers to vouch for their own credibility during the prosecution’s rebuttal case; (6) in allowing the prosecution to submit a list of E sco’s incoming and outgoing cell phone calls, and; (7) in consulting with the jury prior to sentencing Esco. Finding no error, we affirm the judgment of the circuit court.
FACTS AND PROCEDURAL HISTORY
¶ 3. Esco’s conviction is the result of a botched attempt to rob William Curtis James, Jr., at the McDonald’s restaurant in Madison, Mississippi during which James was shot. As of June 2005, James owned and operated a landscaping and house-washing business. The record reflects that James operated his business on a cash basis, and it was common knowledge that James usually had a large amount of money.
¶ 4. The day before he was shot, James received a phone call from an unidentified male who wanted to utilize James’s business services. James and the unidentified caller arranged to meet the following day at McDonald’s in Madison. The next day, James went to McDonald’s as planned. James later testified that he noticed two men inside McDonald’s. James described one man as black with dread locks, and the other as a “bright-skinned” man on a telephone. James testified that the “bright-skinned” man nodded at James. The man with dread locks left McDonald’s while James was still eating.
¶ 5. James’s meeting with the unidentified caller never took place. The unidentified caller contacted James on James’s cell phone and told him that an unexpected emergency arose, and he would not be able to meet at McDonald’s that day. James finished his lunch, left McDonald’s, and walked across the parking lot to his Chevrolet Suburban SUV. As James got into his Suburban, he realized that the man with dread locks was in his backseat.
¶ 6. The man with dread locks was armed with a pistol. He ordered James to start the SUV. Before James could start the SUV, the “bright-skinned” man ran around to the front of James’s SUV. By James’s description, the “bright-skinned” man “was trying to get in and push [him] on over.” According to James, the “bright-skinned” man said, “[S]hoot the f-,” and the man with dread locks shot James. James fell out of his SUV and staggered inside McDonald’s. James was *1159 seriously, if not critically injured, but after a long and difficult recovery, he survived.[1]
¶ 7. The man with dread locks and the “bright-skinned” man ran across the parking lot and got into a white Ford Mustang where a driver was waiting for them. Darwin Freeman, an employee of the Madison Public Works Department, was at the intersection of Highway 51 and Main Street that day when he noticed the two men run across the parking lot and jump into the white Mustang. Freeman contacted the Madison Police Department and relayed what he saw. As the Mustang fled the scene, it passed through a road construction area. The Mustang almost hit one construction worker, and another construction worker saw someone throw a pistol from the Mustang.
¶ 8. Law enforcement officers stopped a white Mustang on Rice Road, but as the officers approached the Mustang, the driver sped away. During the pursuit, the Mustang moved into oncoming traffic and nearly hit a motorcycle patrolman head on. The patrolman was able to avoid a collision with the Mustang by virtue of a radio warning from pursuing officers.
¶ 9. Officers were not able to stop the Mustang again. However, authorities quickly centered them pursuit on the Parc Apartments in Ridgeland, Mississippi where a white Mustang was spotted. Law enforcement officers quickly converged on the Parc Apartments and apprehended the man with dread locks, later identified as Isaiah Sanders. Esco was questioned, but he was not arrested at that time. Law enforcement officers found a revolver in a bush near McDonald’s, as well as a semiautomatic pistol and a baseball hat on the side of Old Canton Road.
¶ 10. Months later, James received a call from Joann Rogers. Rogers was in McDonald’s the day that James was attacked. Rogers told James that on that day, she saw Esco sitting in a car in the McDonald’s parking lot. Rogers also told James that Esco was on the phone. James took Rogers to meet with Investigator Mike Brown of the Madison Police Department. As a result, an arrest warrant was issued for Esco; however, Esco could not be found in Mississippi. Esco had disobeyed the requirements of his federal probation, left the southern district of Mississippi, and fled to Tennessee. However, United States marshals apprehended Esco as he left a Wal-Mart in Clarksville, Tennessee.
¶ 11. On September 8, 2005, a Madison County grand jury returned an indictment against Esco and charged him with (1) aggravated assault, (2) armed robbery, (3) conspiracy to commit aggravated assault, (4) conspiracy to commit armed robbery, (5) possession of a firearm by a prior convicted felon, and (6) felony evasion. Esco pled not guilty, and in August 2006, he went to trial.
¶ 12. The prosecution called twenty-one witnesses, but the witness who arguably was most damaging to Esco was the “bright-skinned” man — Michael Johnson.[2] Johnson testified that on June 14, 2005, *1160 Esco picked him up in a white Cadillac Escalade. Afterwards, they picked up Sanders. According to Johnson, their specific plan was to “hit a lick,” meaning they planned to rob someone. Sanders had a nine-millimeter pistol, but they wanted another weapon, so they went to Sanders’s house to pick up a revolver. Afterwards, they borrowed a white Ford Mustang from Esco’s friend.
¶ 18. Johnson testified that Esco did not plan to take part in the robbery. Instead, Esco planned to wait in the car and drive when Johnson and Sanders were finished robbing James. Esco drove around and ended up in the parking lot of McDonald’s and Winn Dixie. When they saw James go inside McDonald’s, Esco moved the Mustang over to a nearby parking lot. Johnson and Sanders went inside McDonald’s. Johnson sat down, and Sanders went to the bathroom. While Johnson was inside McDonald’s, he and Esco talked over the phone.
¶ 14. According to Johnson, Sanders left McDonald’s before James and got in James’s SUV. When James left McDonald’s, Johnson followed him. At the point that James reached his SUV, Sanders already was waiting for him in the backseat. James and Sanders struggled, and Sanders shot James. At that point, Johnson and Sanders ran to the Mustang, and Esco drove away. Johnson testified that Esco was pulled over by a patrol car, but Esco sped away when the officers exited their vehicle. During the trip to Esco’s apartment, Johnson threw his hat and Sanders’s nine millimeter pistol out of the window. When Esco stopped the car, they all got out and ran.
¶ 15. Esco called Nikike Shavers as a witness. Shavers testified that she was with Esco on the day that James was shot. According to Shavers, she arrived at Esco’s apartment around 10:30 a.m. Shavers stated that two men came to Esco’s apartment. Shavers knew one of them as “Dread.” The two men asked Esco if they could borrow his SUV. Shavers testified that Esco told them that his SUV was not working properly. According to Shavers, the two men asked if they could borrow her car so they could get something to eat, but she said no. Because they kept insisting, Esco finally relented and gave them the keys to a white Mustang. Shavers explained that the Mustang did not belong to Esco, but he had the keys to it. Shavers testified that the two men left, and she and Esco waited for them to return. According to Shavers, she left two hours later, and the two men had not returned. Shavers went on to testify that, while she was in her car, a friend of hers contacted her and told her that Esco was in the news related to a robbery and a shooting. Shavers testified that she told her friend that Esco could not have taken part in the robbery because she had been with Esco that day.
¶ 16. Esco took the witness stand and testified in his own defense. Esco testified that he had access to a white Mustang on the day James was shot. Esco explained that he borrowed the Mustang from a friend because the “engine light” was on in his SUV. Esco corroborated Shavers’s testimony in that he stated Shavers was at his apartment when Sanders and a man he only knew as John arrived at his apartment.[3]
*1161 ¶ 17. According to Esco, the two men wanted James’s telephone number because James owed them $2,400. Esco testified:
When I went upstairs for to get the number, [Sanders] had my phone, and I called the number down the stairs where I stay in a townhouse. And I called the number, and [Sanders] put the number in the phone as ID in the phone. And when I came downstairs, he had it in the phone.
¶ 18. Next, Esco testified that Sanders and John wanted to borrow a car. According to Esco, Dread asked Esco to tell Shavers to let them borrow her car so they could get something to eat. Eventually, Esco told them they could use the Mustang. Esco testified that he also gave them his cell phone and asked them to charge the phone battery in the Mustang. According to Esco, Sanders and John left, and he and Shavers waited for them to return. However, Shavers left after a while.
¶ 19. Esco went on to testify that shortly after Shavers left, the Mustang pulled into the parking lot at a high speed. Esco walked around the apartments and asked someone if he saw anyone get out of the Mustang. That person had not seen anyone. Esco went to the Mustang, opened the door, and looked for his cell phone, but he could not find it.
¶ 20. According to Esco, law enforcement officers arrived within minutes. Esco told one officer that the Mustang belonged to a friend of his. Another officer came from a nearby building with Sanders. Esco testified that he did not want to “tell on” Sanders, but the officer kept asking Esco to whom had he loaned the Mustang. Esco told the officer to call his lawyer, but Esco’s lawyer told him to cooperate. At that point, Esco relented and told the officer he let Sanders and John borrow the Mustang. Sanders was taken into custody, but Esco was not.
¶ 21. Esco confirmed that he knew Johnson and that he met Johnson during the time they were incarcerated in Beaumont, Texas. However, Esco testified that he did not see Johnson the day James was shot. When asked about the fact that the summary prepared by Investigator Brown showed an incoming phone call from Johnson at 2:58 p.m. and an outgoing call from his own phone at 8:49 p.m., Esco explained that his “phone was in the Mustang, supposed to have been in the Mustang on the charger at that time.” Esco also confirmed that his cell phone was taken from Sanders’s shirt pocket when Sanders was arrested.
¶ 22. As for his presence in Clarksville, Tennessee, Esco testified:
I was on federal, I was on federal papers for three years. And I had like a couple of months to go for to get off papers. And the federal marshal came over to my apartment looking for me, relating to this crime. And I noticed, I knowed that if they got me in custody, they won’t give me a bond because I was on federal papers, and I didn’t have that long, so I really wanted to try to stay out of their way until I get off papers, and then I would turn myself in and get a bond for I can get back out of jail, for I didn’t want to be incarcerated for my kids.
¶ 23. During cross-examination, the prosecution asked Esco to explain why, if Sanders and John had his cell phone as he claimed, and they had been gone for as *1162 long as he claimed, he did not call his own cell phone. Esco answered, “I called it and it was off when I called it.” The prosecution then asked Esco how many times he called his cell phone. Esco responded that, approximately an hour or two after Sanders and John left, he called his cell phone, “[l]ike four or five times.” The prosecution then asked Esco to explain why, according to the log of phone calls, the phone was working the rest of the day. Esco could not explain that.
¶ 24. The jury found Esco guilty of all counts. The circuit court sentenced Esco to life without parole on all counts, with the sentences in counts one through five to run concurrently, but the circuit court set count six to run consecutively to the other counts. As a result, Esco effectively must serve two consecutive life sentences. Esco now appeals.
ANALYSIS
I. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE PROSECUTION TO INTRODUCE MICHAEL JOHNSON’S GUILTY PLEA COLLOQUY ON REDIRECT.
¶ 25. During cross-examination of Johnson, Esco’s attorney attempted to impeach Johnson’s direct testimony with portions of Johnson’s guilty plea colloquy. Esco’s attorney intended to demonstrate that Johnson left out details during his guilty plea discussion with the circuit court, whereas he was much more specific during Esco’s trial. Specifically, Esco’s attorney noted that on direct, Johnson testified that Sanders used a nine-millimeter pistol when they tried to rob James. Esco’s attorney stated, “when you entered your plea of guilty on July 31st of this year, you did not tell the court that a nine-millimeter gun was involved, did you? You just said it was a revolver!.]” Esco’s attorney then stated, “you never told the court, did you, that [Esco] came and picked you up at Target? You never told them that, did you? You just told them y’all met over there at [Esco’s] apartment, didn’t you?” Johnson responded that, during his guilty plea, the circuit court “was questioning [him]. The questions that [the circuit court] asked [him], [he] was answering them. [He] didn’t just say specifically about [sic] anything.”
¶ 26. On redirect, the prosecution asked Johnson whether his testimony was consistent with his statements made during his guilty plea. Johnson said it was. Johnson explained that his present testimony was more detailed than his statements made during his guilty plea. The prosecution then moved to introduce Johnson’s thirty-two page plea colloquy as an exhibit to Johnson’s testimony on the basis that it was a prior consistent statement.
¶ 27. Esco’s attorneys objected on the basis that the guilty plea colloquy was (1) improper bolstering, (2) cumulative, and (3) introduction of the entire statement would incorporate topics about which Johnson did not testify during cross-examination. The prosecution argued that Johnson’s entire guilty plea colloquy was admissible as a prior consistent statement pursuant to Mississippi Rule of Evidence 801(d)(1). The circuit court concluded that Johnson’s entire guilty plea colloquy was admissible as a prior consistent statement, and “[i]t doesn’t have to be redacted because the only other things in there are they are advising him of his rights in going throughout the colloquy that I’m required to go through, and that’s not prejudicial at all to anything.” On appeal, Esco claims the circuit court committed reversible error when it allowed the prosecution to introduce Johnson’s entire guilty plea colloquy. We disagree.
*1163 ¶ 28. In reviewing this issue, we are mindful that:
the admissibility of evidence rests within the discretion of the trial court. However, this Court must also determine whether the trial court employed the proper legal standards in its fact findings governing evidence admissibility. If in fact the trial court has incorrectly perceived the applicable legal standard in its fact findings, the Court applies a substantially broader standard of review. However, a denial of a substantial right of the defendant must have been affected by the court’s evidentiary ruling. Furthermore, the trial court’s discretion must be exercised within the scope of the Mississippi Rules of Evidence and reversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused occurs.
Clemons v. State, 732 So.2d 883, 887-88(¶ 18) (Miss.1999) (quoting Peterson v. State, 671 So.2d 647, 655-56 (Miss.1996)).
¶ 29. Counsel for Esco did not object to the admissibility of Johnson’s guilty plea colloquy based on hearsay. An “[o]b-jection on one ground at trial waives all other grounds for objection on appeal.” Rubeustein v. State, 941 So.2d 735, 758(1175) (Miss.2006). Accordingly, it is unnecessary to analyze this issue as it pertains to whether the guilty plea was inadmissible hearsay as Esco may not raise this issue for the first time on appeal.
¶ 30. Instead, counsel for Esco objected to the introduction of Johnson’s guilty plea colloquy on the basis that it was (1) improper bolstering, (2) cumulative, and (3) beyond the scope of cross-examination. During cross-examination, Esco’s attorney attempted to impeach Johnson with his guilty plea colloquy to show that Johnson omitted certain facts during his guilty plea, yet testified to those facts during Esco’s trial. Therefore, introduction of Johnson’s guilty plea colloquy was admissible to rehabilitate Johnson’s testimony in that it tended to demonstrate that the circuit court did not focus on those facts during Johnson’s guilty plea. That is, Johnson’s entire guilty plea showed that Johnson did not necessarily omit facts as much as the circuit court focused on certain facts during the guilty plea and did not ask Johnson to elaborate on those matters to the degree to which he testified at Esco’s trial.
¶ 31. We cannot conclude that the circuit court abused its discretion when it allowed the prosecution to introduce Johnson’s entire guilty plea colloquy. The guilty plea colloquy was admissible to rebut Esco’s direct and implied charge of omission and/or fabrication of necessary facts. While we do not hold that entire guilty pleas are always admissible, under these precise circumstances, the entire guilty plea was necessary to demonstrate that Johnson only left out certain details in his guilty plea because the circuit court did not necessarily focus on those details. Because the circuit court did not abuse its discretion, we find no reversible error in this issue.
II. WHETHER THE CIRCUIT COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT JOHNSON’S STATEMENT COULD NOT BE CONSIDERED AS SUBSTANTIVE EVIDENCE.
¶ 32. Esco claims the circuit court committed l'eversible error when it did not sua sponte instruct the jury that it could not consider Johnson’s guilty plea colloquy as substantive evidence. The State insists that because Esco did not request a limiting instruction, Esco is procedurally barred from asserting this issue on appeal, and the lack of a limiting instruction was not plain error. We agree. Pursuant to Mississippi Rule of Evidence 105, “[w]hen *1164 evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.” (emphasis added). Rule 105 places the burden of requesting a limiting instruction upon counsel. Rushing v. State, 911 So.2d 526, 540(1132) (Miss.2005). Consequently, this issue is procedurally barred for failure to request a limiting instruction at trial.
III. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE PROSECUTION TO INTRODUCE A 1991 CONVICTION OF STRONG-ARM ROBBERY WHEN ESCO WAS SIXTEEN YEARS OLD WITHOUT FIRST DETERMINING WHETHER THIS EVIDENCE WAS MORE PREJUDICIAL THAN PROBATIVE.
¶ 33. This issue stems from the prosecution’s decision to use Esco’s 1991 conviction for strong-arm robbery as proof of Esco’s status as a prior convicted felon to prove Esco was guilty of possession of a firearm by a prior convicted felon. Pre trial, Esco sought to prohibit the prosecution from introducing evidence of Esco’s 1991 strong-arm robbery conviction at trial. Esco argued that because he had been previously convicted of other felonies, the prosecution did not need to bring up the 1991 conviction to prove that Esco was a prior convicted felon. Esco also argued that it would affect his ability to testify in his defense.
¶ 34. The prosecution argued that it could use whatever evidence it chose to prove its case. The circuit court held:
the State is allowed to put on the case they want to put on, not what a defendant wants. And I realize there may be some attendant difficulties to a defendant in that regard, but this is not a Peterson situation, it’s not an impeachment where the court needs to weigh the factors relative to similarity. It is a State’s substantive elements proof, so the State will be allowed to do that.
Esco claims the circuit court committed reversible error. We disagree.
¶ 35. At the outset, it is necessary to distinguish this issue from those pertaining to use of prior convictions as a method to impeach a witness. The prosecution did not use Esco’s prior conviction to impeach him. Instead, the prosecution used Esco’s prior conviction as substantive evidence of Esco’s status as a prior convicted felon as it relates to his possession of a firearm. However, Esco submits that the prosecution’s use of Esco’s 1991 strong-arm robbery conviction was still impermissible. According to Esco, “[t]he United States Supreme Court addressed this very issue” in Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).
¶ 36. In Old Chief, the Supreme Court held that a trial court committed reversible error when it allowed the prosecution to present evidence of a pri- or assault conviction to prove that the defendant was a prior convicted felon in possession of a firearm. Notably, the Supreme Court’s decision turned on the fact that the defendant in Old Chief offered to stipulate that he was a prior convicted felon. Id. at 186, 117 S.Ct. 644. Esco draws our attention to the fact that, during his case-in-chief, he testified and admitted that he was a prior convicted felon. Esco cites Langley ex rel. Langley v. Miles, 956 So.2d 970, 973(¶ 8) (Miss.Ct.App.2006) for the proposition that an admission is the equivalent *1165 of a stipulation.[4] Esco argues that because he admitted he was a prior convicted felon during his case-in-chief, he, in effect, stipulated that he was a prior convicted felon. Esco’s argument has no merit in law or logic.
¶ 37. The prosecution was obligated to prove its case during its case-in-chief. Had the prosecution sat back, failed to prove that Esco was a prior convicted felon, and neglected to offer any proof of Esco’s status as a prior convicted felon, Esco could have successfully moved for a directed verdict after the prosecution ceased its case-in-chief. To that end, an admission after the prosecution ceases its case-in-chief is not the equivalent of a stipulation. Had Esco stipulated that he was a prior convicted felon, then this case would be similar to Old Chief, but Esco did not offer to stipulate. Accordingly, this case is not like Old Chief, and “the prosecution [was] entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.” Old Chief, 519 U.S. at 186-87, 117 S.Ct. 644. We cannot find that the circuit court abused its discretion. Consequently, we find no merit to this issue.
IV. WHETHER THE CIRCUIT COURT ERRED IN NOT GIVING A LIMITING INSTRUCTION REGARDING THE PROPER USE OF ESCO’S PRIOR CONVICTIONS.
¶38. In this issue, Esco claims the circuit court committed reversible error when it did not sua sponte give a limiting instruction regarding the prosecution’s use of Esco’s conviction for strong-arm robbery. As in issue two, the State claims Esco is procedurally barred from raising this issue for the first time on appeal. We agree.
V. WHETHER THE CIRCUIT COURT ERRED IN OVERRULING ESCO’S OBJECTION TO BEING CROSS-EXAMINED AS TO WHETHER THE LAW ENFORCEMENT WITNESSES WERE LYING.
¶ 39. During the cross-examination of Esco, the prosecution asked him whether law enforcement witnesses were lying when they testified. Counsel for Esco objected and suggested that it was improper for the prosecution to “compar[e] one testimony to another one.” The circuit court overruled the objection and said, “[y]ou asked that another witness lied and the State can do the same thing if you do it.” The prosecution proceeded to ask Esco whether at least four law enforcement witnesses lied. Esco responded that those officers, in fact, lied when they testified as to what Esco was doing or what he said when they saw him at the Parc Apartments.
¶ 40. Esco claims the circuit court committed reversible error when it allowed the prosecution to ask him whether those law enforcement officers lied. We are mindful that:
[attorneys are afforded wide latitude in arguing their cases to the jury but are not allowed to employ tactics which are inflammatory, highly prejudicial, or rea *1166 sonably calculated to unduly influence the jury. We will review allegations of misconduct to determine whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.
Ross v. State, 954 So.2d 968, 1001(¶70) (Miss.2007) (internal citations and quotations omitted).
¶ 41. Eseo cites numerous cases from other jurisdictions, but he cites no Mississippi authority to support his argument. According to the State, because Esco cites no Mississippi authority for this issue, it is procedurally barred. We reject the State’s meritless argument for a procedural bar in this instance. If we were to follow the State’s reasoning, our body of law would be reduced to a stalemate and would never progress beyond that which exists at this very moment. Be that as it may, neither party cites any Mississippi precedent that has addressed this particular issue.
¶ 42. Other jurisdictions have reviewed similar issues and have reached various results. There are three competing views regarding whether a prosecutor may ask a defendant whether prosecution witnesses lied during their testimony. Many jurisdictions have adopted one of two bright-line rules. That is, some jurisdictions have concluded that it is categorically improper for the prosecution to ask a defendant whether prosecution witnesses lied.[5] In contrast, at least two states have found it categorically proper to ask such questions. See, e.g., Manzano v. State, 282 Ga. 557, 651 S.E.2d 661, 664 (.2007); Fisher v. State, 128 Md.App. 79, 736 A.2d 1125, 1162-64 (1999), vacated in part on other grounds by Fisher v. State, 367 Md. 218, 786 A.2d 706, 744 (2001).
¶ 43. Finally, other jurisdictions have declined to adopt a bright-line rule and have, instead, reached conclusions regarding the propriety of such questions based on other circumstances. For example, the Illinois Supreme Court reached such a result in People v. Kokoraleis, 132 Ill.2d 235, 138 Ill.Dec. 233, 547 N.E.2d 202, 216 (1989), in which it stated that while “it is generally improper to ask a witness on cross-examination whether an adverse witnesses] testimony is truthful,” because the defendant testified that the police “framed” him by providing him with information about the murders and caused him to repeat those facts in his statements, the cross-examination at issue was not inappropriate. See also People v. Overlee, 236 A.D.2d 133, 140, 666 N.Y.S.2d 572 (N.Y.App.Div.1997); State v. Hart, 303 Mont. 71,15 P.3d 917, 923-24 (2000).
¶ 44. In State v. Pilot, 595 N.W.2d 511, 517 (Minn.1999), a prosecutor asked a defendant to comment on the veracity of three of the prosecution’s witnesses. The Minnesota Supreme Court held that, in general, “were they lying” questions are improper, but such questions were not categorically improper. Id. at 518. The Minnesota Supreme Court stated that, under certain circumstances, “were they lying” questions could have probative value: (a) “in clarifying a particular line of testimony,” (b) “in evaluating the credibility of a witness claiming that everyone but the witness lied or,” (c) where the witness “flatly denies the occurrence of events.” *1167 Id. Because the defendant’s theory of the case in Pilot “was that the [S]tate’s witnesses were lying and that the evidence against him was fabricated as part of a vast conspiracy to convict him of a crime he did not commit” the credibility of the State’s witnesses was “in central focus.” Id. Accordingly, the Minnesota Supreme Court found no error with the prosecution’s use of “were they lying” questions because such questions “could well have assisted the jury in weighing [the defendant’s] own veracity and in evaluating his conspiracy theory.” Id.
¶ 45. Though we do not reach a general conclusion regarding whether such questions are per se proper or improper, we find the reasoning in Pilot persuasive. It is clear that Esco’s theory of the case was that the law enforcement officers and the prosecution formed a conspiracy effort to connect him to the events that took place at McDonald’s. During opening statements, counsel for Esco told the jury:
So now they take [Sanders] to the jail. They start talking to [Sanders], Look, you’re a little fish in big pond. We’re not really interested in you. We’re interested in [Esco]. You put [Esco] in this deal, they’re going to tell him. He gives a video statement, which you’ll probably see. He testifies, and we intend to call him. You’ll probably see a video where he says [Esco] was in it, and he was the one that planned all this, and schemed it and so forth. Well, the bottom line is it didn’t help. He got a 40-year sentence on a plea of guilty. He pled guilty and got 40 years. He has already been sentenced. And he is going to tell you, as he has already told the district attorney’s office, [Esco] really didn’t have anything to do with this.
Now, Michael Johnson on the other hand, we will show you, insisted on his innocence up until July 31st of this year, at which time he entered a plea of guilty on the condition that he, quote, truthfully tell the story, and put [Esco] in it.
¶ 46. Counsel for Esco clearly argued that the prosecution was not interested in Sanders, but was interested in Esco-so much so that the prosecution misled Sanders into implicating Esco and that it did not “help” Sanders to do so. Counsel for Esco went on to state that the prosecution only offered a plea bargain to Johnson in exchange for “put[ting] Esco in it.”
¶ 47. Esco added to his conspiracy theory of the case during his direct testimony. Esco testified that when the Mustang pulled into the parking lot at the Parc Apartments, he went outside to find Sanders and “John,” but he could not find them. According to Esco, two police officers approached him on foot. Esco’s attorney asked Esco whether he knew those two officers, and Esco responded, “[y]eah, they pull me over almost every other night when I be going home.” Later, Esco testified that the law enforcement officers set up a lineup and placed him in it. Esco went on to testify that “they came through several times. Several times he rode through and they kept looking. And then I heard one officer say that, he said, damn, you know, he said, damn, just like that. He said, he didn’t pick Feriando.” That is, according to Esco, the officer was disappointed when Esco was not identified. Esco further testified that “[a]ll of the officers got on the stand, and these officers pull me over almost every other night. If they seen [sic] me driving that Mustang or seen a black male driving that Mustang, they’d noticed me because they pull me over.” Esco unequivocally connected law enforcement in general with a desire to implicate him in the events at McDonald’s. Additionally, Esco clearly testified that each and every officer had a general preexisting bias toward him.
*1168 ¶ 48. Further, it is noteworthy that the prosecution did not initially ask Esco whether all of the law enforcement officers were lying. Shortly before Esco’s attorney concluded his examination of Esco, Esco’s attorney asked, “did you answer all [the law enforcement officers’] questions?” Esco responded, “[y]es, sir.” On cross-examination, the prosecution asked Esco whether he made a particular statement to Officer Young. Esco denied that he made that statement. The prosecution then asked Esco whether Officer Young lied when he testified that Esco made that statement. Esco could have testified that Officer Young was mistaken, but he did not. Instead, over objection, Esco testified, “[h]e lied, and it’s some more officers lied.” At that point, the prosecution began to question Esco regarding which officers lied — which was absolutely within the prosecution’s cross-examination rights. “[T]he right of confrontation and cross-examination ... extends to and includes the right to fully cross[-]examine the witness on every material point relating to the issue to be determined that would have bearing on the credibility of the witness and the weight and worth of his testimony.” Nalls v. State, 651 So.2d 1074, 1076 (Miss.1995).
¶49. To be sure, the credibility of a witness is solely for the jury to weigh and consider. Harris v. State, 970 So.2d 151, 156(¶ 20) (Miss.2007). Be that as it may, under the precise circumstances of this matter, the cross-examination at issue was not improper and did not constitute any form of prosecutorial misconduct. The prosecution was entitled to rebut Esco’s theory of the case. The natural effect of that rebuttal was not to create unjust prejudice against Esco, and it did not result in a decision influenced by prejudice. Accordingly, we find no merit to this issue.
VI. WHETHER ESCO WAS DENIED A FAIR TRIAL WHEN THE PROSECUTION WAS ALLOWED, ON REDIRECT, TO ASK THE LAW ENFORCEMENT WITNESSES TO VOUCH FOR THEIR OWN CREDIBILITY.
¶ 50. In its rebuttal case, the prosecution called four law enforcement officers. The prosecution asked three of those officers whether they testified truthfully during the prosecution’s case-in-chief. Esco claims this was improper redirect. According to Esco, it is not permissible for the prosecution to ask the officers to vouch for their own credibility. Esco did not raise this issue at trial. He is procedurally barred from raising it for the first time on appeal. Boggan v. State, 894 So.2d 581, 584(¶ 10) (Miss. Ct.App.2004).
VII. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE PROSECUTION TO INTRODUCE A DOCUMENT PREPARED BY THE POLICE PURPORTING TO BE A LIST OF THE INCOMING AND OUTGOING PHONE CALLS PRESENT ON STATE’S EXHIBIT 26, A CELL PHONE.
¶ 51. In his seventh issue, Esco finds fault with the circuit court’s decision to allow the introduction of a summary of phone calls from Esco’s cell phone. During Investigator Brown’s testimony, the circuit court allowed the prosecution to submit into evidence a list of outgoing and incoming calls that Investigator Brown prepared by examining Esco’s cell phone. Counsel for Esco objected. The circuit court asked Esco’s attorney for the basis of his objection. Esco’s attorney responded, “[b]ecause there’s no indication on his list what the date was, that the calls came in and went out. He just testified to it. If *1169 they’re telling me that I can take that phone right now and hook it up and it would show those and show that it was on June 14th, I wouldn’t have a problem with it.” The prosecution responded that the list was admissible as a summary pursuant to Mississippi Rule of Evidence 1006. The circuit court then overruled Esco’s objection.
¶ 52. Esco claims the circuit court committed reversible error. According to Esco, the list was inadmissible hearsay that did not fall under any exception to the hearsay rule. However, Esco did not object on the basis that the list was hearsay at trial, and he may not do so for the first time on appeal. Accordingly, our analysis does not address the admissibility or inadmissibility of the summary in light of its status as hearsay.
¶ 53. Esco’s objection at trial seems to have been that he could not verify that the summary was accurate. However, the record indicates that the prosecution supplemented its discovery responses prior to the trial, and there is no indication that the prosecution did not divulge prior to trial that it would present evidence from Esco’s cell phone. If the prosecution did not divulge that it would present Esco’s incoming and outgoing cell phone records, Esco failed to provide this Court with sufficient information to reach that conclusion. It is Esco’s burden to provide this Court with an adequate record. What is more, Esco did not object on the basis that he was unaware that the prosecution would submit the incoming and outgoing cell phone calls as evidence. Accordingly, Esco’s attorney could have reviewed the cell phone’s call log at any time prior to trial, and if there was any inconsistency between Esco’s actual call log and Investigator Brown’s summary, Esco’s attorney could have cross-examined Investigator Brown regarding those inconsistencies. Accordingly, we find no merit to this issue.
VIII. WHETHER THE CIRCUIT JUDGE ERRED IN CONSULTING WITH THE JURY PRIOR TO PRONOUNCING SENTENCE.
¶ 54. After the jury found Esco guilty on all counts, the circuit judge recessed to visit with the jury. When the recess was over, the circuit judge sentenced Esco. Esco claims the circuit judge erred by conferring with the jury outside of his presence. In particular, Esco takes issue with the circuit court’s statement, “I was somewhat surprised at the amount of anxiety I saw on some of the potential jurors’ faces and heard, even up here at the bench, on some others. They just simply are scared of you.” According to Esco, by visiting with the jury outside of his presence, the circuit court was exposed to information that he did not have a chance to rebut. Esco claims this Court must vacate his sentence and remand this matter. We disagree.
¶ 55. Apparently, Esco’s appellate counsel misunderstands the circuit judge. That misunderstanding is most likely due to counsel’s omission of the circuit judge’s entire statement, and that can be remedied by examining the circuit judge’s entire statement after sentencing Esco. The circuit judge did not state that he recognized fear from the jurors during his visit with them after they reached their verdict. Instead, the circuit judge stated, “[d]uring the process of voir dire, I was, I guess for lack of a better word, somewhat surprised at — I mean I have been at this for a while. I was somewhat surprised at the amount of anxiety I saw on some of the potential jurors’ faces and heard, even up here at the bench, on some others. They just *1170 simply are scared of you.” (emphasis added).
¶ 56. Esco was sentenced as a habitual offender pursuant to Mississippi Code Annotated section 99-19-83 (Rev.2007). Accordingly, the circuit judge had no discretion in sentencing Esco, as section 99-19-83 mandated that the circuit judge sentence Esco to life imprisonment for each conviction. Therefore, nothing that could have been discussed during the circuit judge’s recess could have influenced the circuit judge, and nothing Esco could have said in rebuttal could have altered the circuit judge’s decision. As a result, we find no merit to this issue.
IX. WHETHER THE ERRORS TAKEN TOGETHER ARE CAUSE FOR A NEW TRIAL.
¶ 57. Esco claims this Court must reverse due to the cumulative effect of the errors. We have not found that the circuit court committed any errors. It follows that there can be no cumulative effect of errors. Accordingly, we find no merit to this issue.
¶ 58. THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, AGGRAVATED ASSAULT, AND SENTENCE OF LIFE IMPRISONMENT; COUNT II, ARMED ROBBERY, AND SENTENCE OF LIFE IMPRISONMENT; COUNT III, CONSPIRACY TO COMMIT AGGRAVATED ASSAULT, AND SENTENCE OF LIFE IMPRISONMENT; COUNT IV, CONSPIRACY TO COMMIT ARMED ROBBERY, AND SENTENCE OF LIFE IMPRISONMENT; COUNT V, POSSESSION OF A FIREARM BY A CONVICTED FELON, AND SENTENCE OF LIFE IMPRISONMENT; AND COUNT VI, FELONY EVASION, AND SENTENCE OF LIFE IMPRISONMENT, WITH SENTENCES FOR COUNTS I, II, III, IV, AND V TO RUN CONCURRENTLY AND SENTENCE FOR COUNT VI TO RUN CONSECUTIVELY TO COUNTS I, II, III, IV, AND V, ALL AS A HABITUAL OFFENDER, WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, AND IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.

. James was treated by Dr. James Kolb, an emergency room physician at the University of Mississippi Medical Center. Dr. Kolb testified; the projectile was not retrieved from James, that the projectile fragmented into two pieces after it entered James's chest, “shattered a couple of ribs,” damaged the lower part of James's right lung, and damaged part of James's liver.

. Johnson testified in exchange for a deal with the prosecution. Johnson is Isaiah Sanders's cousin, and Johnson met Esco while Johnson was incarcerated for carjacking.

. Esco later testified that "John is known as [Sanders's] brother, but I don't know that, you know.” Esco elaborated that he thought Sanders and John were brothers, but he was not certain of that. However, during cross-examination, Esco testified that he did not know if John was Sanders's "brother, cousin or what.” Esco was able to describe John, though. Esco described John as having "small dreads ... dark skinned, and about, *1161 I’d say about six-one, somewhere off in there." Esco also testified that John was "from Miami, but [he was] staying in Jackson.” Esco was not certain whether John was still in Jackson at the time of his trial.

. To be precise, Langley does not unequivocally hold that an admission is the same thing as a stipulation. Instead, Langley held that "Rule 36(b) states that any matter admitted pursuant to the rule ‘is conclusively established unless the court on motion permits the withdrawal or amendment of the admission.’ A matter deemed admitted due to a failure to timely serve responses is the functional equivalent of a stipulation or an admission in a pleading." Langley, 956 So.2d at 973(118) (emphasis added).

. See Daniel v. State, 119 Nev. 498, 78 P.3d 890, 904 (2003); Beaugureau v. State, 56 P.3d 626, 635-36 (Wyo.2002); State v. Singh, 259 Conn. 693, 793 A.2d 226, 239 (2002); Knowles v. State, 632 So.2d 62, 65-66 (Fla. 1993) (holding that the error was harmless); State v. Casteneda-Perez, 61 Wash.App. 354, 810 P.2d 74, 79 (1991); State v. Flanagan, 111 N.M. 93, 801 P.2d 675, 679 (Ct.App.1990) (holding that the error was harmless).