No. 99-023

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 332

303 Mont. 71

15 P. 3d 917

THE STATE OF MONTANA,

Plaintiff and Respondent,

v.

DAVID HART,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Susan Watters, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William F. Hooks, Attorney at Law, Helena, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; C. Mark Fowler,

Assistant Attorney General, Helena, Montana

Dennis Paxinos, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs: June 8, 2000
Decided: December 14, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 David Hart appeals from the conviction and sentence entered by the Thirteenth Judicial District Court, Yellowstone County, sentencing him to 12-years' imprisonment for felony assault. We affirm Hart's conviction, but strike part of his sentence and remand for entry of judgement consistent with this opinion.

¶2 Hart 's appeal raises the following issues:

¶3 1. Whether the District Court erred when it permitted the State to submit rebuttal testimony?

¶4 2. Whether the District Court erred when it permitted the State to ask Hart whether he believed the State's witnesses were lying?

¶5 3. Whether the State violated Hart's right to a fair trial when presenting its closing arguments?

¶6 4. Whether the District Court erred when it imposed a dangerous weapon sentence enhancement?

## BACKGROUND

¶7 On February 9, 1998, the State filed an Information charging Hart with felony assault. The State alleged that David Hart struck his niece, Shandel Hart, in the face with his fist several times and struck her in the back of the head and shoulder with a cattle prod in

violation of § 45-5-202, MCA. Hart pled not guilty and the court appointed counsel. Hart was tried by jury on July 13 and 14, 1998.

¶8 During Hart's trial, the State presented the testimony of three eyewitnesses to Hart's assault: Shandel Hart, Michelle Floor, and Vanessa Sutton. The State also presented the testimony of the arresting officer, Jason Gartner. Shandel testified that she was at her home on the evening of February 5, 1998, with her 17-year-old ward, Vanessa Sutton; Vanessa's boyfriend, Michael; Shandel's friend, Michelle Floor; and Michelle's three children. Shandel had planned on cutting Michelle's children's hair that evening. Shandel's uncle, David Hart, and his friend, Roy Pearl, stopped by Shandel's house at around 7:30 or 8 p.m. When Hart and Roy arrived, Shandel and Michelle were home alone, the others having left earlier in Michelle's car to buy dinner.

¶9 Michelle testified that Shandel planned to repay Hart some money she owed him with the money she earned from the haircuts. Michelle owed Shandel $20 for the haircuts but only had a $50 bill. Roy offered to drive Michelle somewhere in order to change the bill. Roy and Michelle drove to the Tap Inn, a nearby bar, leaving Hart and Shandel alone. Shandel testified that after Roy and Michelle departed, Hart showed her a cattle prod that he was carrying in his pocket.

¶10 About 15 minutes after Michelle and Roy departed, Hart left Shandel's house and walked to the Tap Inn. Michelle testified that Hart entered the bar and sat down next to her and Roy. Michelle bought Hart a drink and gave him the money that Shandel owed him. Michelle testified that Hart made a rude sexual comment to her. She told Hart that she was offended by his comment. Hart then pulled the cattle prod out of his pocket and pointed it at her. Michelle got up, flipped Hart's cowboy hat off his head, moved to the other side of the bar and had another drink. Michelle testified that Hart was incensed. Shortly thereafter, Hart and Roy left the bar without Michelle and returned to Shandel's house.

¶11 While Hart, Roy, and Michelle were at the Tap Inn, Vanessa, her boyfriend, and Michelle's children returned to Shandel's house. They were watching television when Hart and Roy walked in the door. Shandel testified that Hart had been gone about an hour and a half. Shandel testified that Hart was angry and was shouting epithets about Michelle. As Hart was ranting about Michelle, she walked in the front door. Shandel testified that Hart ran over to the front door, grabbed Michelle by the hair and began hitting her with his fists. Shandel grabbed Michelle around the waist and pulled her away from Hart. Shandel shouted that Hart was not going to beat Michelle up in Shandel's house and in front of

Michelle's children. Hart then hit Shandel in the face with the cattle prod. Hart hit Shandel with the cattle prod approximately five or six times about her head and shoulders. The cattle prod was not activated at the time.

¶12 Michelle testified that while Hart was attacking Shandel with the cattle prod, she gathered her children, took them out to the garage, and called 911. Michelle returned to the scene of the assault and informed Hart that she had called the police. Once again, Hart came at Michelle. Michelle grabbed a two-by-four board and swung it at Hart. Hart ducked out of the way and Michelle missed, breaking a window with the board. Michelle then yelled, "There they are right now, they're here!", indicating that the police had arrived. Hart and Roy immediately fled out the back door of Shandel's house.

¶13 Officer Jason Gartner was dispatched to Shandel's home. Officer Gartner arrived, discovered that Hart and Roy had fled in an El Camino, and radioed in a description of their vehicle to a dispatcher. Another officer stopped Hart and Roy a few blocks from Shandel's home. Officer Gartner drove to the scene of the stop to provide assistance. He testified that Roy was arrested for DUI and that Hart appeared extremely intoxicated. Officer Gartner noticed a cattle prod behind the passenger seat where Hart had been sitting and seized it. He later showed the cattle prod to Shandel and she identified it as the weapon Hart had used to assault her.

¶14 After the State presented its case-in-chief, Hart testified on his own behalf. Hart stated that he went to Shandel's house that night because she had offered to repay him some money she had borrowed. Hart maintained that the cattle prod was on Shandel's dining room table. During the State's cross-examination, Hart testified that he visited Shandel's house two to three times a week and that the cattle prod was always sitting on her table. Hart stated that he thought Shandel had the cattle prod in case her dogs became aggressive. With regard to his altercation with Shandel, Hart testified that he was walking out the door as Michelle was walking in and he ran into her. When he turned around, Shandel was coming at him with the cattle prod in her hand. In the process of attempting to take the cattle prod away from Shandel, Hart grabbed her wrist and shoved it towards her face, injuring her. Hart testified that he never had the cattle prod in his possession prior to his altercation with Shandel. During cross-examination, the State asked Hart whether Michelle, Vanessa, and Shandel were lying when they testified that they saw Hart with the cattle prod prior to the assault. Hart answered affirmatively.

¶15 After Hart's testimony, the State recalled Shandel Hart as a rebuttal witness. On direct

examination by the State during its case-in-chief, Shandel had denied owing Hart money. During her rebuttal testimony, Shandel testified that Hart came to her house because he and Roy needed money and he wanted to sell her some pork tenderloins that he had stolen. Shandel testified that Hart made money by shoplifting. Shandel contended that Hart confided to her that he carried the cattle prod so that if someone attempted to catch him while he was shoplifting, he could use it to stop them.

¶16 The jury found Hart guilty of felony assault. The District Court issued its Judgment and Commitment on September 24, 1998, imposing a sentence of ten years in the Montana State Prison for the commission of felony assault and an additional two years for the use of a weapon to be served consecutively. Hart appeals.

## ISSUE ONE

¶17 Whether the District Court erred when it permitted the State to submit rebuttal testimony?

¶18 After Hart's testimony, the State offered the testimony of Shandel in rebuttal. The State contended that Shandel would rebut Hart's testimony that Shandel owed him $50 and rebut Hart's testimony that he did not possess the cattle prod. The District Court allowed the State to present Shandel's testimony over Hart's objections. Shandel testified that Hart did not stop by her house to collect money she owed him, but rather that he stopped by to sell her some pork tenderloins that he had stolen. Shandel also testified that Hart and Roy made their money from shoplifting and that Hart had informed her that he carried a cattle prod in order to prevent people from catching him shoplifting.

### A. Proper Rebuttal

¶19 Hart first contends that the District Court erred in admitting Shandel's rebuttal testimony because it was not proper rebuttal testimony. Hart maintains that he did not open the door to this testimony nor did he raise a new matter in his testimony. The State asserts that Hart raised the issue of who owned the cattle prod, to what use the cattle prod was previously put, and how it came to be in Shandel's house for the first time during his testimony.

¶20 We have stated that a district court has "wide discretion in determining the scope and extent of re-examination as to new matters brought out on cross-examination." *State v.*

*Veis*, 1998 MT 162, ¶ 19, 289 Mont. 450, ¶ 19, 962 P.2d 1153, ¶ 19. As with a district court's determination of the scope and extent of redirect examination, we will review a district court's admission of rebuttal testimony to determine whether the district court abused its discretion. Rebuttal testimony is proper only if it tends to counteract a new matter offered by the adverse party. *State v. Daniels* (1984), 210 Mont. 1, 10, 682 P.2d 173, 178.

¶21 The District Court did not abuse its discretion in admitting the State's rebuttal testimony. Shandel's rebuttal testimony tended to counteract a new matter offered by Hart. The new matter offered by Hart was that Shandel owned the cattle prod and used it to train her dogs. During his direct examination, Hart testified that the first time he observed the cattle prod was when he saw it on Shandel's dining table. During the State's cross-examination, Hart further testified that he did not own the cattle prod, that he saw the cattle prod at Shandel's house about six months to a year prior to the incident, and that he thought Shandel had it in case her dogs became aggressive.

¶22 Hart maintains that he did not offer this new matter because it was raised during the State's cross-examination and not during his direct testimony. Hart's contention is incorrect. Hart offered this new matter during his direct testimony when he testified that the first time he saw the cattle prod was six months to a year ago on Shandel's dining room table. During the State's cross-examination, the prosecutor questioned Hart about this new matter. In response to the State's question about whether he thought there was anything unusual about Shandel having a cattle prod on her dining room table for the past six months, Hart stated, "I just thought it was in case one of these [sic] dogs got mean or something." This new matter was offered by Hart. The fact that it was more fully explored by the State during its cross-examination of Hart is irrelevant.

¶23 Lastly, Shandel's testimony tended to counteract this new matter raised by Hart. Shandel testified that Hart owned the cattle prod and that he told her that he used it to prevent people from catching him shoplifting. Therefore, we conclude that the District Court did not abuse its discretion when it admitted the State's rebuttal testimony.

### B. Evidence of Other Crimes, Wrongs, or Acts

¶24 Hart next contends that Shandel's testimony that he made his living stealing food, that he was carrying the cattle prod to use against people who attempt to stop him from stealing, and that the reason that he was at Shandel's home was to sell her stolen food was

evidence of other crimes, wrongs, or acts which should have been excluded pursuant to Rule 404(b), M.R.Evid. The State argues that this testimony did not violate Rule 404(b) because it was admitted for the purpose of challenging Hart's testimony that Shandel possessed the cattle prod.

¶25 We review a district court's admission of evidence to determine whether the court abused its discretion. *State v. Rogers*, 1999 MT 305, ¶ 11, 297 Mont. 188, ¶ 11, 992 P.2d 229, ¶ 11. The admissibility of evidence of prior crimes, wrongs, and acts is reviewed pursuant to the Modified Just Rule, which provides that in order to be admissible the other crimes, wrongs, or acts must be: (1) similar; (2) not remote in time; (3) not admitted to prove the character of a person in order to show that he acted in conformity with such character; and (4) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *Rogers,* ¶ 25

¶26 The State has not contested the fact that Shandel's testimony contained evidence of other wrongful acts committed by Hart, nor has Hart claimed that the prior acts were dissimilar or too remote in time to the current charges. Therefore, the admissibility of Shandel's testimony under Rule 404(b) depends on the last two Modified Just requirements: whether the evidence of other wrongful acts was admitted to prove Hart's character in order to show that he acted in conformity with such character; and whether the probative value of Shandel's testimony is outweighed by the danger of unfair prejudice.

¶27 Shandel's testimony was not admitted to prove Hart's character in order to show that he acted in conformity with such character. The court explicitly stated that it was allowing Shandel's testimony in order to rebut Hart's testimony that the cattle prod was always in Shandel's house. We think that Shandel's rebuttal testimony provided the jury with a detailed account of Hart's presence in her house and Hart's possession of the cattle prod and was not admitted to prove Hart's character. Providing the jury with a reason why Hart was carrying the cattle prod is probative of the fact that Hart indeed had the cattle prod and used it to assault Shandel.

¶28 The probative value of Shandel's testimony is not outweighed by the danger of any unfair prejudice its admission may have created. It is inevitable that evidence of other crimes, wrongs, or acts will have some prejudicial effect on a criminal defendant. *State v. Southern*, 1999 MT 94, ¶ 38, 294 Mont. 225, ¶ 38, 980 P.2d 3, ¶ 38. However, relevant evidence will be inadmissible under the fourth part of the Modified Just Rule only when "its probity is substantially outweighed by the danger of unfair prejudice." *Southern*, ¶ 38.

The prejudicial effect of relevant evidence will substantially outweigh its probative value when such evidence will prompt the jury to decide the case on an improper basis. *Southern*, ¶ 39.

¶29 Shandel's rebuttal testimony was potentially highly prejudicial. Testimony that Hart made his living from shoplifting and carried a cattle prod to prevent others from catching him could certainly prompt a jury to decide that Hart was guilty of assaulting Shandel because he had a propensity for criminal conduct and not because he did in fact assault Shandel. We are not convinced, however, that the prejudicial effect of Shandel's testimony substantially outweighs its probative value.

¶30 Hart contends that the issue of why he had the cattle prod had no probative value because, in order to obtain a conviction for assault, all the State had to prove was that he purposely or knowingly caused bodily injury to Shandel with a weapon. We disagree. Hart misunderstands the central issue of this case: who possessed the cattle prod during the altercation between Shandel and Hart. Rule 404(b), M.R.Evid., explicitly allows for the admission of other wrongs to prove opportunity. By explaining *why* Hart carried the cattle prod, Shandel's testimony was highly probative of the fact that Hart was in fact carrying the cattle prod and thus had the opportunity to strike Shandel with it. This testimony directly contradicted the defense's theory, as testified to by Hart himself, that Shandel owned the cattle prod, that Shandel used it for disciplining her dogs, that the cattle prod was sitting on her dining room table, that she attacked Hart with it, and that Hart injured her in an attempt to take it away from her.

¶31 The District Court did not abuse its discretion pursuant to Rule 404, M.R.Evid., in admitting Shandel's rebuttal testimony.

## ISSUE TWO

¶32 Whether the District Court erred when it permitted the State to ask Hart whether he believed the State's witnesses were lying?

¶33 During the State's cross-examination of Hart, the prosecution asked Hart if Michelle, Vanessa, and Shandel were lying when they testified that Hart pulled the cattle prod out of his pocket. Hart responded in the affirmative, indicating that each of the State's eyewitnesses had lied about that fact. Hart's counsel objected to this line of questioning.

¶34 On appeal, Hart contends that the District Court erred when it permitted the State to ask him whether the State's witnesses were lying. In support of his argument, Hart refers us to *State v. Webb* (1992), 252 Mont. 248, 828 P.2d 1351, and *State v. Lunstad* (1993), 259 Mont. 512, 857 P.2d 723. The State claims that we have not decided whether it is impermissible for the State to ask a defendant whether other witnesses were lying. The State argues that there is a division of authority among other jurisdictions on the permissibility of such questioning and that we should side with those courts which permit such questions.

¶35 We have not yet decided whether it is reversible error to allow the State to ask a defendant whether other witnesses were lying. In *State v. Campbell* (1990), 241 Mont. 323, 787 P.2d 329, our only decision in which we directly discussed this issue, we were unwilling to reverse the defendant's conviction by reason of the fact that the State asked the defendant whether the State's witness had lied, because the defendant did not answer the question. *Campbell*, 241 Mont. at 327, 787 P.2d at 332. We also observed that "[w]hen a defendant goes up on the witness stand in his own behalf, and denies the commission of the crime with which he is charged, a very wide latitude of cross-examination is allowed." *Campbell*, 241 Mont. at 327, 787 P.2d at 332 (quoting *State v. Rhys* (1909), 40 Mont. 131, 136, 105 P. 494, 496).

¶36 In two subsequent decisions, we analyzed whether the State had properly laid the foundation for the admission of evidence by asking the defendant whether other witnesses had lied. We did not determine whether allowing the questioning by itself constituted reversible error. In *Webb*, we held that a defendant's testimony that the State's informant had lied was an insufficient basis for the State's offer of opinion testimony regarding the truthfulness of the informant pursuant to Rule 608, M.R.Evid. *Webb*, 252 Mont. at 256, 828 P.2d at 1356. In *Lunstad*, we held that a defendant's testimony on cross-examination that the victim had lied was an insufficient basis for the admission of the victim's prior consistent statements under Rule 801(d)(1)(B), M.R.Evid. *Lunstad*, 259 Mont. at 516, 857 P.2d at 725-26.

¶37 Courts in other jurisdictions differ on whether a prosecutor may ask a defendant if other witnesses have lied. Some courts have held that it is categorically improper for the prosecution to ask a defendant whether a witness has lied. *See United States v. Sanchez* (9th Cir. 1999), 176 F.3d 1214, 1220; *United States v. Boyd* (D.C. Cir. 1995), 54 F.3d 868, 871; *United States v. Richter* (2d Cir. 1987), 826 F.2d 206, 208; *Scott v. United States* (D. C. App. 1993), 619 A.2d 917, 924-25; *State v. Casteneda-Perez* (Wash. Ct. App. 1991),

810 P.2d 74, 79; *State v. Flanagan* (N.M. Ct. App. 1990), 801 P.2d 675, 679. Other courts appear to have held that this line of questioning is categorically proper. *See Whatley v. State* (Ga. 1998), 509 S.E.2d 45, 51 *cert. denied* 526 U.S. 1101, 119 S.Ct. 1582, 143 L. Ed.2d 676; *Fisher v. State* (Md. App. 1999), 736 A.2d 1125, 1162-63. Finally, some courts have staked out a middle ground, holding that the permissibility of this type of questioning depends on the circumstances. *See State v. Pilot* (Minn. 1999), 595 N.W.2d 511, 518; *People v. Overlee* (N.Y.App. Div. 1997), 236 A.D.2d 133, 666 N.Y.S.2d 572, 577; *State v. Morales* (Ariz. Ct. App. 2000), 10 P.3d 630, ¶13.

¶38 We disagree with the line of cases which hold that asking a defendant whether other witnesses are lying is always improper. Generally, the rationale of these decisions is that "were they lying" questions infringe upon the role of the jury to make credibility determinations. *See Boyd*, 54 F.3d at 871 (holding that these questions "infringed on the jury's right to make credibility determinations"); *Richter*, 826 F.2d at 208 (observing that "[d]eterminations of credibility are for the jury . . . and not for witnesses") (citation omitted); *Casteneda-Perez*, 810 P.2d at 79 ("Unquestionably, to ask a witness to express an opinion as to whether another witness is lying does invade the province of the jury."); *Flanagan*, 801 P.2d at 679 ("it is the role of the jury to determine the credibility of witnesses").

¶39 We are not convinced that permitting the State to ask a defendant whether other witnesses are lying will always impermissibly infringe upon the jury's role to make determinations of credibility. The difference between the defendant testifying that other witnesses have lied and the defendant testifying to facts which differ from the facts as testified to by other witnesses is not so great that one line of questioning is categorically improper. Especially in factual situations such as this one, in which the only important distinction between the defendant's testimony and the victim's testimony is that each witness is claiming that the other one did it, the difference between the defendant testifying that "yes, the victim lied, she attacked me" or the defendant testifying that "she attacked me" is, for purposes of the jury's role in making credibility determinations, irrelevant. In either situation, the jury must still decide which witness is more credible. This is entirely unlike the danger posed by a prosecutor's comment on an accused's guilt or innocence which does invade the province of the jury and is an usurpation of its function because the jurors may simply "adopt the prosecutor's views instead of exercising their own independent judgment as to the conclusions to be drawn from the testimony." *Campbell*, 241 Mont. at 328, 787 P.2d at 333 (quoting 88 A.L.R. 3d 449, 454-55 (1978)). We do not believe that the jury is likely to simply adopt the defendant's conclusions

regarding the credibility of other witnesses.

¶40 We also disagree with those decisions which hold that "were they lying" questions are always proper. We believe that there may be circumstances in which this line of questioning will be improper because it has no probative value in that it does nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence. *See Pilot*, 595 N.W.2d at 518. However, we also believe that there may be circumstances in which "were they lying" questions have probative value in clarifying a particular line of testimony, in evaluating the credibility of a defendant who is claiming that everyone else is lying, or when a witness flatly denies the occurrence of events. *Pilot*, 595 N.W.2d at 518.

¶41 For instance, in *Pilot*, the focus of the defense was that the state's witnesses were lying and that the evidence against the accused was fabricated as part of a vast conspiracy to convict him of a crime he did not commit. *Pilot*, 595 N.W.2d at 518. The Supreme Court of Minnesota held that it was not error to permit the prosecution to pose "were they lying" questions during its cross-examination of the defendant because the questions "could well have assisted the jury in . . . evaluating his conspiracy theory." *Pilot*, 595 N.W.2d at 518.

¶42 Similarly, in *Overlee*, the defendant had testified on direct that a witness for the prosecution was a liar. *Overlee*, 666 N.Y.S.2d at 575. On cross-examination, the prosecution asked the defendant whether the prosecution's witnesses were lying. The New York Supreme Court, Appellate Division, drew a distinction between permissible cross-examination and prosecutorial misconduct, stating that:

> [A] distinction has to be made between a defendant's testimony that conflicts with that of the People's witnesses and yet is susceptible to the suggestion that the witnesses spoke out of mistake or hazy recollection and the situation where, as here, the defendant's testimony leaves open only the suggestion that the People's witnesses have lied. In the latter circumstance, the prosecution has the right to ask whether the witnesses are liars.

*Overlee, 666 N.Y.S.2d at 576.*

¶43 We refuse to adopt a bright-line rule regarding the propriety of questioning the defendant about the truthfulness of other witnesses. Because we hold that "were they lying" questions are not categorically improper, we commit the decision on whether to

allow this type of questioning in any particular instance to the sound discretion of the district court. We will only overturn a court's decision to admit or deny "were they lying" questions in those cases in which the propriety of asking such questions is clear.

¶44 We do not believe that allowing the prosecutor to ask Hart whether the State's witnesses were lying was clearly improper. As in *Overlee* and *Pilot*, the only explanation for the difference between the testimony of the State's witnesses that Hart had the cattle prod in his pocket and Hart's testimony that the cattle prod had been on Shandel's dining room table for the past six months was that somebody was lying. The prosecution's questioning of Hart elicited relevant evidence by focusing the jury's attention on the central issue of the case. Thus, we conclude that the District Court did not abuse its discretion in permitting the State to ask Hart whether other witnesses were lying.

### ISSUE THREE

¶45 Whether the State violated Hart's right to a fair trial when presenting its closing arguments?

¶46 During the State's closing arguments, the prosecutor stated:

> But let's look at what the defendant said. I mean, he didn't have to get up on the witness stand and testify. He has a right not to do that. But he elected, nevertheless, to get up and tell you his version of what happened. And I submit that most of what the defendant said is completely unworthy of belief and should be rejected by you. After all, the defendant is the only one who was allowed to sit through the testimony of every other witness before he got up to testify and, I suggest, had an opportunity to fabricate his testimony based on what the other witnesses said.

¶47 The defense did not raise an objection to the State's summation at trial. For the first time on appeal, Hart contends that the District Court erred when it allowed the prosecutor to observe that Hart exercised his right to be present at trial which provided him an opportunity to fabricate his testimony based on the testimony of the State's witnesses. The State claims that Hart waived this claim by failing to make a contemporaneous objection and that we should decline to review it under our common law power of plain error review. We agree.

¶48 Pursuant to § 46-20-104(2), MCA, "Failure to make a timely objection during trial

constitutes a waiver of the objection except as provided in 46-20-701(2)." Hart does not contend that any of the exceptions to the requirement of contemporaneous objection as listed in § 46-20-701(2), MCA, apply. We have held that, notwithstanding the failure to object to an alleged error and the inapplicability of § 46-20-701(2), MCA, we may review a claimed error which affects fundamental constitutional rights where failing to review it may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. *State v. Finley* (1996), 276 Mont. 126, 137, 915 P.2d 208, 215.

¶49 In order to invoke our power of review under *Finley*, Hart must "initially demonstrate that a fundamental right constitutionally guaranteed to him was implicated by the plain error which he claims." *See State v. Pizzichiello*, 1999 MT 123, ¶ 11, 294 Mont. 436, ¶ 11, 983 P.2d 888, ¶ 11. Hart acknowledges that after the filing of his initial brief the United States Supreme Court rejected this exact claim under the federal constitution in *Portuondo v. Agard* (2000), 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 2d 47[1]. In his reply brief, Hart limited his claim of error to Article II, Section 24 of the Montana Constitution-specifically, the right to "meet witnesses against him face to face." Hart observes that we have held that this right is a "fundamental right" which is not included in the federal constitution. *See State v. Clark*, 1998 MT 221, ¶¶ 22-24, 290 Mont. 479, ¶¶ 22-24, 964 P.2d 766, ¶¶ 22-24.

¶50 Hart has demonstrated that his fundamental right to face to face confrontation as guaranteed by Article II, Section 24 may have been implicated by the prosecutor's summation. As Hart observes, because of the unique constitutional language of Article II, Section 24 of the Montana Constitution, the United States Supreme Court's decision in *Portuondo* is not dispositive of this issue. *See Clark*, ¶ 24. Although we have never held that a defendant's right to meet adverse witnesses face to face is implicated during a prosecutor's closing arguments, it is conceivable that an accused's right to face to face confrontation could be burdened by allowing summation comments which negatively remark on the accused's presence during the testimony of adverse witnesses. We decline to determine whether this potential burden is a constitutionally impermissible one, however, because as addressed below, Hart has failed to meet the second prong of *Finley*.

¶51 In order to invoke our common law power of plain error review, Hart must also show that "failing to review the claimed error at issue would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial proceedings or compromise the integrity of the judicial process." *Pizzichiello*, ¶ 15. The instances in

which we have exercised our common law power of plain error review are rare. *See Pizzichiello*, ¶ 10 (observing that, as of time of briefing, we had only exercised it in 3 cases out of 14 requests).

¶52 Hart has not shown that failing to review the admission of the State's comments during summation would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial proceedings, or compromise the integrity of the judicial process. Hart maintains that allowing the prosecutor to make such comments during her closing arguments "had the effect of chilling the exercise of his constitutional rights." However, the prosecutor's statements could not have "chilled" Hart's exercise of his right to confront adverse witnesses face to face because those comments occurred during the prosecutor's summation, after he had already exercised his right to meet adverse witnesses. Furthermore, we are not convinced that by refusing to review this claim raised for the first time on appeal, Hart will have suffered a manifest miscarriage of justice. It is not at all "manifest" that Hart's conviction was the result of this alleged error. Three eyewitnesses all testified that Hart had the cattle prod in his pocket and that Hart assaulted Shandel with it. We are also not convinced that by refusing to review this claim we will leave unsettled the question of the fundamental fairness of Hart's trial proceedings or that we will compromise the integrity of the judicial process. We will continue to use our inherent power of plain error review sparingly and only in exceptional cases meeting one of the above criteria. *See Finley*, 276 Mont. at 138, 915 P.2d at 215; s*ee also State v. Dahlin*, 1998 MT 113, 289 Mont. 182, 961 P.2d 1247 (reviewing claim that defendant did not waive right to a jury trial in writing as required by statute); *State v. Weaver*, 1998 MT 167, 290 Mont. 58, 964 P.2d 713 (reviewing claim that jury verdict may not have been unanimous). Hart's claim does not present such an exceptional case.

¶53 We decline to address Hart's contention that the prosecutor's summation violated his right to face to face confrontation as guaranteed under Article II, Section 24 of the Montana Constitution. Hart has failed to demonstrate that this is an appropriate use of our common law power of plain error review.

## ISSUE FOUR

¶54 Whether the District Court erred when it imposed a dangerous weapon sentence enhancement?

¶55 The District Court sentenced Hart to ten-years' imprisonment for felony assault with a

weapon and enhanced Hart's sentence by two additional years imprisonment pursuant to § 46-18-221, MCA, the dangerous weapon enhancement statute. In *State v. Guillaume*, 1999 MT 29, 293 Mont. 224, 975 P.2d 312, we held that the application of the weapon enhancement statute to felony convictions where the underlying offense requires proof of the use of a weapon violates the double jeopardy provision of Montana's Constitution. *Guillaume*, ¶ 16. The holding of *Guillaume* applies retroactively to all cases not yet final. *State v. Aguilar*, 1999 MT 159, ¶ 13, 295 Mont. 133, ¶ 13, 983 P.2d 245, ¶ 13. The State concedes that the District Court's sentence is in violation of *Guillaume*. Therefore, we vacate the enhanced portion of Hart's sentence and remand for entry of judgment consistent with this opinion.

¶56 Affirmed in part and vacated in part.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

1. In *Portuondo*, the United States Supreme Court held that a prosecutor's remarks in summation to the effect that because the defendant was present during the testimony of all the other witnesses he was afforded the opportunity to fabricate his testimony did not violate the defendant's right to be present at trial, right to confront witnesses, or right to due process. *Portuondo*,120 S. Ct. at 1123.