

DA 13-0109

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 55

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

BRYAN JAMES REDLICH,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Beaverhead, Cause No. DC 11-3418
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Wendy Holton, Attorney at Law, Helena, Montana

        For Appellee:

        Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss, Assistant Attorney General, Helena, Montana

        Jed Fitch, Beaverhead County Attorney, Dillon, Montana

Submitted on Briefs: January 8, 2014
Decided: March 4, 2014

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    A jury found Bryan Redlich guilty of disorderly conduct, a misdemeanor, and two counts of felony assault with a weapon. Redlich received concurrent ten-year sentences at the Department of Corrections for the two felonies, and a ten-day sentence at the county jail for the misdemeanor. Redlich now appeals his convictions. We affirm. We restate the issues on appeal as follows:

¶2    1. Whether there was sufficient evidence to support Redlich's convictions for felony assault with a weapon.

¶3    2. Whether the District Court abused its discretion in limiting a justifiable use of force defense to Count II (felony assault with a gun).

¶4    3. Whether the District Court abused its discretion in allowing the State to present rebuttal evidence to impeach defense witness testimony.

¶5    4. Whether the District Court erred in denying Redlich's motion to dismiss for lack of a speedy trial.

**BACKGROUND**

¶6    On May 29, 2011, Redlich left a bar in Dillon at closing time, after a night of drinking and playing pool with his girlfriend, Rebecca Ginter. A number of people were standing outside of the bar, including three University of Montana Western football players, Scott Keiter-Charles, Kalani McLaughlin, and Rashad Peniston. From here, the accounts of the night's events diverge. Redlich stated that he had previously encountered the football players, while the football players maintained that they had either never interacted, or never seen Redlich before. Redlich and Ginter testified that the football

players started walking toward Redlich to instigate a fight, and that Redlich told them that he did not want any trouble. Redlich stated he was holding his pool cue at this time, twirling it like a baton, and not trying to swing it at anyone.

¶7 Witness Alison Scott and the football players testified that Redlich was in the middle of the street swinging the pool cue at the football players, waving it erratically and violently in a criss-cross pattern, and taking "baseball swings." Scott and the football players stated that Redlich was agitated and yelling racial slurs directed at the football players.

¶8 Keiter-Charles stated that he was afraid that Redlich could have attacked him at any time with the pool cue, and that he would have been unable to get away from Redlich due to a knee injury. McLaughlin testified that Redlich was not exactly swinging the pool cue at him, but he was swinging it at Keiter-Charles. Peniston testified that he thought Redlich was going to hit Keiter-Charles and McLaughlin with the pool cue. Peniston then disarmed Redlich, and threw the pool cue aside. Redlich and Ginter testified that Peniston kicked Redlich in the process of disarming Redlich, which Peniston denied. Scott and the football players averred that Redlich then threw a beer bottle toward McLaughlin and Keiter-Charles. Redlich believed that the football players were pursuing him, and he ran towards his home at the Creston Motel. The football players then began walking to Peniston's house, which happened to be in the same neighborhood as the Creston Motel.

¶9 Ginter then drove to the Creston Motel in search of Redlich. She did not find him, but she did find their friend Kyle Reed, and told him that three black men were chasing

3

Redlich and beating him up. Reed then grabbed a baseball bat and went to look for the football players. When Reed found them, he approached them with the bat while yelling racial slurs at them.

¶10 At this moment, Scott and the football players testified that Redlich appeared with a gun and threatened the football players. The football players saw the gun and scattered. Scott, who was a friend of Redlich, testified that she approached Redlich, put her hands on his shoulders, and tried to convince him to put the gun down.

¶11 Redlich, Reed, and Ginter testified that no gun was involved, and that they did not see Scott at the scene. Officers then arrived, and Redlich came out of the Creston Motel with a weed eater, which he was "revving," while continuing to yell racial slurs directed at the football players. An officer ordered Redlich to put down the weed eater, and Redlich eventually turned it off. The officer then questioned Redlich on the scene, and he denied having a gun or threatening the football players with any type of weapon. At trial, Redlich testified that he did not have a gun, but he did pick up a hammer from the bed of his truck when he saw Reed being chased by two of the football players.

¶12 On June 7, 2011, the State charged Redlich with three counts of assault with a weapon, and one count of disorderly conduct. The State alleged:

> Count I: Redlich purposely or knowingly caused a reasonable apprehension of serious bodily injury by swinging a pool cue at a group of people including Keiter-Charles, McLaughlin, and Peniston and attempting to hit them with it.
>
> Count II: Redlich purposely or knowingly caused a reasonable apprehension of serious bodily injury by pointing a revolver-type pistol at a group of people including Keiter-Charles, McLaughlin, Peniston, and Scott and stating that he was going to shoot them.

4

Count III: Redlich purposely or knowingly caused a reasonable apprehension of serious bodily injury by waving and revving a running weed eater at a group of people including Keiter-Charles, McLaughlin, Peniston, and Scott.

Count IV: Redlich knowingly disturbed the peace by repeatedly yelling profanities and racial slurs at a group of black men in attempt to start a fight.

Redlich was arrested twice for violating his conditions of release, and was incarcerated a total of 46 days prior to trial.

¶13 Trial was originally set for January 31, 2012. On December 21, 2011, the State filed an unopposed motion for a continuance due to a scheduling conflict. The District Court granted the motion, and trial was reset for May 29, 2012. On May 14, 2012, Redlich moved for a continuance after his case was reassigned to a new public defender. The District Court granted the motion, and trial was reset for September 25, 2012.

¶14 On September 20, 2012, Redlich filed a motion to dismiss for lack of a speedy trial, which was denied. The jury trial was held as scheduled. At the close of the State's case, Redlich moved for judgments of acquittal on all charges. Regarding the first two assault charges, Redlich argued that the State had failed to prove a reasonable apprehension of bodily injury by any the individuals named in those counts. The District Court found that Peniston could not be considered as a victim in Count I, but otherwise denied the motion.

¶15 Later in the trial, Redlich called Reed to testify. During cross-examination, the State questioned Reed about a conversation he had with Scott a few days after the incident. Reed testified that Scott approached him in a bar and asked him a few questions about the incident. The State then called Scott as a rebuttal witness, who testified that

Reed had approached her to discuss the incident. Redlich objected on the grounds of relevance, which the court overruled. Scott told Reed that she did not want to talk to him, and that she thought Redlich should not have pulled a gun on them. Reed told her that Redlich did not have a gun, but rather, a hammer, and that she should change her story.

¶16 The jury found Redlich guilty of Counts I, II, and IV, and not guilty of Count III on September 27, 2012. Redlich filed a motion for a new trial, or in the alternative, a judgment of acquittal, in which he argued in part that there was insufficient evidence to prove the elements of assault as to either McLaughlin or Keiter-Charles regarding Count I. The District Court denied Redlich's motion for a new trial. He was sentenced on January 15, 2013, and the judgment was filed on January 24, 2013.

## DISCUSSION

¶17 ***Issue One: Whether there was sufficient evidence to support Redlich's convictions for felony assault with a weapon.***

## I. Standard of Review

¶18 We review de novo whether sufficient evidence supports a conviction. *State v. Trujillo*, 2008 MT 101, ¶ 8, 342 Mont. 319, 180 P.3d 1153 (citing *State v. Swann*, 2007 MT 126, ¶ 19, 337 Mont. 326, 160 P.3d 511). We view the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *Trujillo*, ¶ 8 (citations omitted).

¶19 We review jury instructions in a criminal case to determine whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case.

*State v. Crawford*, 2002 MT 117, ¶ 15, 310 Mont. 18, 48 P.3d 706.  The right to a unanimous jury verdict represents a fundamental right protected by Article II, Section 26 of the Montana Constitution.  *State v. Vernes*, 2006 MT 32, ¶ 21, 331 Mont. 129, 130 P.3d 169 (citing *State v. Weaver*, 1998 MT 167, ¶ 26, 290 Mont. 58, 964 P.2d 713).  "Unanimity means more than an agreement that the defendant has violated the statute in question; it requires substantial agreement as to the principal factual elements underlying a specific offense."  *Vernes*, ¶ 21 (citing *Weaver*, ¶ 33).

## II.  Argument and Analysis

¶20    Redlich raises his factual insufficiency argument in two steps.  First, he argues that the jury instructions were improper by not requiring the jury to name the victim.  Second, he claims that there was not sufficient evidence to prove that Redlich assaulted McLaughlin for Count I, or that Redlich assaulted Peniston for Count II.  Redlich argues that there is no way of knowing who the jury determined the victims were for each assault charge, and that therefore, it is possible that the jury's verdicts for Count I and Count II are factually unsupported.

¶21    The parties discussed jury instructions on numerous occasions both before and during Redlich's trial.  Prior to trial, Redlich and the State submitted proposed verdict forms.  Redlich's verdict form broke each assault charge down by asking the jury to determine whether Redlich was guilty or not guilty for each individually named victim.  The State's verdict form did not individually name the victims.  Ultimately, the District Court gave the jury a verdict form similar to the State's, stating: "as to Count I, assault with a weapon, we have the line of guilty or not guilty . . . that language [is] repeated for

7

Count II and Count III." The District Court then instructed the jury that in order to convict Redlich of assault with a weapon, the State was required to prove the following beyond a reasonable doubt: 1) That the Defendant caused reasonable apprehension of serious bodily injury in another by use of a weapon or what reasonably appeared to be a weapon, and 2) That the Defendant acted purposely or knowingly. And finally, the District Court also included a unanimity instruction, which stated:

> The State must prove all the elements of Count I, Count II, and Count III as to only one of the alleged victims. However, your verdict must be specific and unanimous as to at least one victim. You may not consider Mr. Peniston as a victim to Count I.

During the trial, Redlich did not object to the verdict form ultimately given by the District Court, the assault with a weapon instruction, or the unanimity instruction. In addition to these instructions, during deliberations the jury asked, "Do we need to decide a victim for Count I?" The District Court and the parties discussed the question, and agreed to submit the following answer to the jury:

> The law requires you to unanimously agree with whether the elements of the crime alleged in Count I have been proved beyond a reasonable doubt. Such proof requires that you must unanimously agree that either Mr. McLaughlin or Mr. Keiter-Charles or both suffered reasonable apprehension of serious bodily injury, or in the alternative, bodily injury. Only in regard to Count I, Mr. Peniston may not be one of those persons. You are not required to identify the person.

¶22 Redlich does not argue that the District Court erred in giving the unanimity instruction. Rather, Redlich implicitly argues that the right to a unanimous jury verdict should be expanded to also require the jury to name the victim of a defendant's conduct. As an initial matter, while we recognize that the submission of a verdict form preserves

8

an objection for subsequent review, *State v. Grimes*, 1999 MT 145, ¶ 39, 295 Mont. 22, 982 P.2d 1037, the record reflects that Redlich failed to object to the verdict form that the District Court ultimately gave to the jury. It was incumbent on Redlich to renew his objection in order to preserve his argument for appeal. Nonetheless, because the State did not raise Redlich's failure to preserve the objection, we will address his implicit argument that the verdict form should have named the victims. Redlich cites no statute, case law, or other authority to support this argument. We have repeatedly held that it is not within our purview to "conduct legal research on [a party's] behalf, to guess as to [the party's] precise position, or to develop legal analysis that may lend support to that position." *State v. Whalen*, 2013 MT 26, ¶ 32, 368 Mont. 354, 295 P.3d 1055 (quoting *Johansen v. Dept. of Nat. Resources & Conserv.*, 1998 MT 51, ¶ 24, 288 Mont. 39, 955 P.2d 653); s*ee also* M. R. App. P. 12(1)(f). Both through its jury instructions, and its written response to the jury's question, the District Court made it clear that the jurors must unanimously agree to the principal factual elements underlying each assault charge with respect to one victim. Furthermore, it is a well-recognized principle of law that juries are presumed to follow the law as given to them. *State v. Turner*, 262 Mont. 39, 55, 864 P.2d 235, 245 (1993); *Opper v. U.S.*, 348 U.S. 84, 95, 75 S. Ct. 158, 165 (1954). Because Redlich has not developed any argument that the District Court's jury instructions failed to fully and fairly instruct the jury on the law, we decline to consider the issue further.

¶23 Next, a person commits assault with a weapon pursuant to § 45-5-213(1)(b), MCA, if he or she purposely or knowingly causes reasonable apprehension of serious

bodily injury in another by use of a weapon or what reasonably appears to be a weapon. Redlich cites McLaughlin's and Peniston's testimony, in which they stated, respectively, that they did not believe that Redlich was swinging the pool cue or pointing the gun directly at each of them. Redlich asserts that this testimony alone disproves the "reasonable apprehension of serious bodily injury" element of assault.

¶24 While Redlich contends that there is no factual basis to support a finding of certain individuals as victims of Counts I and II, he does not dispute that there is a factual basis to support such a claim based on the remaining listed victims (Keiter-Charles for Count I, and Keiter-Charles and McLaughlin for Count II). As to Count I, Keiter-Charles testified that Redlich yelled racial slurs at him in attempts to instigate a fight, swung the pool cue at him like a baseball bat, and that he believed he could be hit at any moment with the pool cue. As to Count II, both McLaughlin and Keiter-Charles testified that they thought Redlich was going to shoot them, and that they feared for their lives. As such, there is sufficient evidence in the record for a rational juror to find all the essential elements of the assault charges beyond a reasonable doubt based on the remaining listed victims. *Trujillo*, ¶ 8.

¶25 ***Issue Two: Whether the District Court abused its discretion in limiting a justifiable use of force defense to Count II (felony assault with a gun).***

**I. Standard of Review and Rule**

¶26 As previously stated, in considering whether a district court has correctly instructed the jury in a criminal case, "we determine whether the instructions, taken as a whole, fully and fairly instructed the jury on the law applicable to the case." *State v.*

10

*Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7 (citing *State v. Archambault*, 2007 MT 26, ¶ 14, 336 Mont. 6, 152 P.3d 698). We will not reverse a district court on the basis of its jury instructions absent an abuse of discretion. *Cybulski*, ¶ 34 (citing *State v. Bieber*, 2007 MT 262, ¶ 22, 339 Mont. 309, 170 P.3d 444). A district court abuses its discretion when it acts arbitrarily or exceeds the bounds of reason resulting in substantial injustice. *Cybulski*, ¶ 34 (citing *Bieber*, ¶ 22). Moreover, to constitute reversible error, any mistake in rendering jury instructions must prejudicially affect a defendant's substantial rights. *Cybulski*, ¶ 34 (citing *Archambault*, ¶ 14).

## II. Argument and Analysis

¶27 Redlich argues that the District Court erred by limiting the instruction on justifiable use of force to Count II. He argues that there was conflicting evidence in the record as to who was the aggressor the night of the incident, and therefore it was error to instruct the jury that it could not consider the defense in regards to the pool cue incident in Count I. The State argues that Redlich did not properly preserve this issue for appeal, and that even if he had, the instruction did not prejudicially affect Redlich.

¶28 As noted above, prior to trial, Redlich submitted proposed jury instructions. Among these proposed instructions was a justifiable use of force instruction that directed the jury to find Redlich not guilty for any count in which Redlich's use of force was justified. Ultimately the District Court gave the following instruction: "You may consider the justifiable use of force only in connection with Count II. It is not available in connection with Counts I, III or IV." Redlich did not object to this instruction.

11

¶29 Even though Redlich did not object to the limited justifiable use of force instruction, the matter is still preserved for appeal. "[W]hen a party proposes an instruction which is rejected by the trial court, that party has made a sufficient objection . . . and has no duty to make a further objection for the record." *Grimes*, ¶ 39; *see also State v. Young*, 206 Mont. 19, 24, 669 P.2d 239, 242 (1983); *State v. Dobson*, 2001 MT 167, ¶¶ 26-27, 306 Mont. 145, 30 P.3d 1077. However, Redlich has failed to demonstrate that limiting the justifiable use of force instruction to Count II prejudicially affected his rights.

¶30 A defendant's use of force is justified when he: 1) was not the aggressor, 2) reasonably believed that he was in imminent danger of unlawful harm, and 3) used reasonable force necessary to defend himself. *State v. Kills on Top*, 243 Mont. 56, 94, 793 P.2d 1273, 1299 (1990) (quoting *State v. DeMers*, 234 Mont. 273, 280, 762 P.2d 860, 865 (1988)). Here, Redlich testified repeatedly that he was not using his pool cue to defend himself from imminent, unlawful force from the football players, but rather, he was casually twirling it "like a baton." Therefore, Redlich's argument that the failure to give the instruction as to Count I prejudiced him is unpersuasive, as his own testimony negates the elements required for a justifiable use of force defense. In sum, the District Court did not act arbitrarily or exceed the bounds of reason in limiting the justifiable use of force instruction to Count II.

¶31    ***Issue Three: Whether the District Court abused its discretion in allowing the State to present rebuttal evidence to impeach defense witness testimony.***

## I.  Standard of Review

¶32    We review a district court's admission of rebuttal testimony for abuse of discretion. *State v. Hart*, 2000 MT 332, ¶ 20, 303 Mont. 71, 15 P.3d 917.

## II.  Argument and Analysis

¶33    Redlich claims that the District Court abused its discretion when it allowed the State to call Scott as a rebuttal witness for the purpose of impeaching Reed. He argues that Scott's rebuttal testimony, in which she recounted Reed's apparent attempt to sway Scott's testimony regarding the gun, was irrelevant and highly prejudicial pursuant to M. R. Evid. 401, 402, and 403. Redlich contends that there was no evidence that he had any knowledge of the conversation between Scott and Reed, and allowing the rebuttal testimony invited the jury to improperly infer that Redlich was behind an attempt to influence Scott's testimony. He further argues that because Reed admitted that the conversation took place, there was no reason for Reed's credibility to be impeached.

¶34    Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness." M. R. Evid. 401. Generally, relevant evidence is admissible, while irrelevant evidence is not. M. R. Evid. 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." M. R. Evid. 403. Additionally, rebuttal testimony is proper only if it tends to

13

counteract a new matter offered by the adverse party. *Hart*, ¶ 20 (citing *State v. Daniels* 210 Mont. 1, 10, 682 P.2d 173, 178 (1984)).

¶35 It is clear that Scott's rebuttal testimony was relevant, and directly addressed the credibility of Reed, as permitted by Rules 401 and 402. As a witness, Reed's credibility was subject to evaluation by the State. Any prejudice to Redlich through the jury drawing a possible inference between the conversation and Redlich is outweighed by the probative value of Scott's testimony regarding Reed's credibility. Therefore, the District Court did not abuse its discretion by allowing the State to recall Scott as a rebuttal witness for the purpose of impeaching Reed. *See State v. Stewart*, 253 Mont. 475, 481, 833 P.2d 1085, 1088 (1992) (The district court did not abuse its discretion by allowing the State's introduction of an undisclosed tape recording to impeach defense witness, because the tape was relevant and probative even though it did not support the criminal charges against defendant.).

¶36 ***Issue Four: Whether the District Court erred in denying Redlich's motion to dismiss for lack of a speedy trial.***

**I. Standard of Review**

¶37 We review a district court's disposition of a motion to dismiss on speedy trial grounds by reviewing the factual findings to determine if they are clearly erroneous. *State v. Stops*, 2013 MT 131, ¶ 16, 370 Mont. 226, 301 P.3d 811 (citing *State v. Sartain*, 2010 MT 213, ¶ 10, 357 Mont. 483, 241 P.3d 1032; *State v. Houghton*, 2010 MT 145, ¶ 13, 357 Mont. 9, 234 P.3d 904). "Factual findings are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of

the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made." *Stops*, ¶ 16 (citations omitted). Whether a defendant has been denied the right to a speedy trial presents a question of constitutional law, which we review de novo to determine whether the district court correctly interpreted and applied the law. *Stops*, ¶ 16 (citing *State v. Couture*, 2010 MT 201, ¶ 47, 357 Mont. 398, 240 P.3d 987; *State v. Hardaway*, 2009 MT 249, ¶ 14, 351 Mont. 488, 213 P.3d 776).

## II. Argument and Analysis

¶38    Redlich argues that he was denied his right to a speedy trial, because at least 75% of the 485-day delay is attributable to the State, and because there is no indication that Redlich desired or did anything to delay the trial. Redlich states that his liberty was significantly restricted due to his pretrial bond restrictions, and that he suffered anxiety and concern.

¶39    A criminal defendant's right to a speedy trial is a fundamental constitutional right guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution. *Couture*, ¶ 3; *State v. Ariegwe*, 2007 MT 204, ¶ 20, 338 Mont. 442, 167 P.3d 815. We analyze a speedy trial claim by examining the following four factors: 1) the length of the delay; 2) the reasons for the delay; 3) the accused's responses to the delay; and 4) prejudice to the accused as a result of the delay. *Ariegwe*, ¶¶ 106-112. Next, we balance these factors with any other relevant circumstances to determine whether the right to a speedy trial has been violated. *Ariegwe*, ¶ 112.

## 1. Length of the Delay

¶40    A defendant's right to a speedy trial commences once a defendant becomes an accused through an arrest, the filing of a complaint, or by indictment or information. *Ariegwe*, ¶ 42 (quoting *State v. Larson*, 191 Mont. 257, 261, 623 P.2d 954, 957-58 (1981)).  Further speedy trial analysis is triggered when 200 days have elapsed between the date that the defendant became an accused, and the trial date.  *Ariegwe*, ¶ 41.  Here, 485 days elapsed between the time that the State arrested Redlich on May 29, 2011, and his September 25, 2012 trial date.  Accordingly, it is undisputed that the 200-day threshold that triggers further speedy trial analysis has been met.

## 2. Reasons for the Delay

¶41    In examining the second factor, we identify each period of delay, attribute the delay to the appropriate party, and assign weight to each period based on the specific cause and motive for the delay.  *State v. Morrisey*, 2009 MT 201, ¶ 54, 351 Mont. 144, 214 P.3d 708; *Ariegwe*, ¶¶ 63-67.  Delay is charged to the State unless the accused caused the delay or affirmatively waived his speedy trial right for that period.  *State v. Billman*, 2008 MT 326, ¶ 20, 346 Mont. 118, 194 P.3d 58; *Ariegwe*, ¶ 65.  Institutional delay is defined as "delay inherent in the criminal justice system and caused by circumstances largely beyond the control of the prosecutor and the accused," and is attributed to the State.  *Ariegwe*, ¶ 68.  However, institutional delay weighs less heavily against the State than intentional delay, "because institutional delay is not one the State actively pursued, whereas intentional delay exposes the defendant to oppressive tactics of the prosecution."  *Ariegwe*, ¶ 68 (quoting *State v. Blair*, 2004 MT 356, ¶ 19, 324 Mont. 444, 103 P.3d 538)

16

(internal quotation marks omitted). Here, the District Court divided the elapsed time into the following five periods that vary from 9 days to 154 days.

### a. The first delay

¶42 The first period of delay is the 9 days from Redlich's arrest on May 29, 2011, to his arraignment on June 7, 2011. The District Court attributed this period of delay to the State as institutional delay. The parties do not dispute this period on appeal.

### b. The second delay

¶43 The second period of delay stretched from June 7, 2011, to the date of the filing of the omnibus order on August 30, 2011, and totaled 84 days.[1] The District Court attributed this period of delay to the State for "lack of diligence," which it found to occupy the middle ground on the culpability scale, weighing more lightly against the State than a deliberate attempt to hamper the defense.

¶44 We have explained that, in analyzing delays under Factor Two, a court does not consider actions or events which did not result in a delay of the trial. *Couture*, ¶ 82 n. 6, (citing *Ariegwe*, ¶ 63). However, where a trial date has not yet been set—as was the situation during the second period of delay identified by the District Court in the present case—and a continuance or some other event delays the setting of the trial date, then that delay must be attributed to the proper party. *Couture*, ¶¶ 80-82. Here, it appears that the filing of the omnibus order was required before the District Court set the first trial date. The District Court ordered Redlich to sign and return the omnibus order within two

---

[1] The District Court and the parties on appeal misstate Redlich's arraignment date and miscalculate the duration of the second period of delay as 77 days. These errors do not affect the District Court's order in any way, or the total number of days of delay.

weeks after the State had completed its portion of the order. Additionally, the State was ordered to request a status hearing if Redlich did not meet this two-week deadline. Because Redlich failed to return the order within the deadline, the prosecutor argued that the 84-day delay associated with filing the omnibus order should be attributed to Redlich. The District Court determined, however, that the State bore responsibility for this delay because the prosecution had failed to request a status hearing. The District Court found that the State lacked diligence in failing to request a status hearing and that this delay occupied "the middle ground" on the culpability scale. The State does not contest this determination on appeal.

### c. The third delay

¶45 The third period of delay encompasses the 154-day interval between the filing of the omnibus order on August 30, 2011, and the initial trial date of January 31, 2012. The District Court attributed this period to the State as institutional delay. The parties do not dispute this period on appeal.

### d. The fourth delay

¶46 The fourth period of delay consisted of 119 days that occurred between the initial January 31, 2012 trial date and the second trial date of May 29, 2012. The District Court attributed this period to the State, which was caused by its motion to continue due to a scheduling conflict. The court did not weigh this period heavily against the State. The parties do not dispute this period on appeal.

18

### e. The fifth delay

¶47 The fifth period of delay totaled 119 days, and ran from the second trial date of May 29, 2012, to the actual trial date of September 25, 2012. The District Court attributed this delay to Redlich, as it was initiated by Redlich's motion to continue. The court rejected Redlich's argument that only a portion of the 119 days should be attributed to him, because he cited no authority for a pro rata apportionment of fault for the delay. Considerable authority exists, however, to support the idea that a court may apportion a period of delay to the parties it deems responsible, or that responsibility for a period of delay may be shared by both parties. *See Morrisey*, ¶¶ 58-60, 64; *Couture*, ¶¶ 80-97; *State v. Charlie*, 2010 MT 195, ¶¶ 51-52, 357 Mont. 355, 239 P.3d 934; *Billman*, ¶¶ 24-27. The District Court, therefore, was not required to attribute this entire period of delay to either Redlich or the State.

¶48 Nevertheless, Redlich's argument with regard to this period of delay is that he "is not responsible for turnover in the [Office of the Public Defender] staff." This contention, for which Redlich cites no authority, is incorrect for purposes of speedy trial analysis. As a general rule, "[d]elay caused by defense counsel is charged against the defendant." *Morrisey*, ¶ 55 n. 10. We have acknowledged Supreme Court authority which states that delay resulting from a "systemic breakdown" in the public defender system could be charged to the State. *Morrisey*, ¶ 55 n. 10 (citing *Vermont v. Brillon*, 556 U.S. 81, 94, 129 S. Ct. 1283, 1292 (2009)). But Redlich has failed to demonstrate that any delay in this case was due to a systemic breakdown in the public defender system.

19

¶49 After considering the facts and reasons for each discrete time period, the District Court allotted to the State the responsibility for 363 days. Much of the time allocated to the State was institutional delay, and thus does not weigh heavily against the State. *Blair*, ¶ 19. While Redlich requests that this Court re-allocate a portion of the fifth period of delay to the State, it is clear that the District Court thoroughly considered the facts, both as to the discrete time periods involved, and the reasons for each of them. The District Court's factual decision was not clearly erroneous.

**3. The Accused's Responses to the Delay**

¶50 Under the third speedy trial factor, the court evaluates the totality of the accused's responses to the delay to ascertain "whether the accused actually wanted a speedy trial." *Ariegwe*, ¶ 76. While an accused certainly has "'no duty to bring himself to trial,'" *Ariegwe*, ¶ 82 (quoting *Barker v. Wingo*, 407 U.S. 514, 527, 92 S. Ct. 2182, 2190), the defendant's responses to the delay nevertheless represent an important consideration in determining whether his or her right to a speedy trial has been violated, *Ariegwe*, ¶ 76, (citing *Barker*, 407 U.S. at 534, 92 S. Ct. at 2194). Thus, while failure to object to pretrial delay does not, by itself, establish that the accused did not want a speedy trial, "an absence in the record of any objections to delay will make it difficult for the accused to prove that he or she was denied a speedy trial." *Ariegwe*, ¶ 82 (citing *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193).

¶51 Redlich argues that he did not desire or benefit from any delay, and that the one period of delay that the District Court attributed to him was due to a personnel change at the Office of the Public Defender. However, the District Court noted that Redlich did not

20

object to the State's motion to continue, and that he did not file his motion to dismiss on speedy trial grounds until one week before trial. Additionally, regarding the second period of delay, Redlich failed to return the omnibus order within the two-week deadline and, as a result, delayed the setting of the first trial date. Although the District Court ultimately attributed the entire second period of delay to the State due to the prosecutor's failure to request a status hearing, the fact that Redlich did not return the omnibus order in time is indicative of his lack of concern for a speedy trial. Based on the totality of the evidence, the District Court found that Redlich's response did not indicate a sincere desire to be brought to trial promptly.

**4. Prejudice to the Accused**

¶52    We consider three sub-factors to evaluate prejudice to the accused: 1) oppressive pretrial incarceration; 2) undue prolonged disruption of the accused's life and aggravated anxiety or concern; and 3) whether the delay has impaired the accused's ability to present an effective defense. *Ariegwe*, ¶ 88 (citing *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193). Because the 485-day delay here significantly exceeded 200 days, we require less proof of prejudice from the defendant, and a greater showing of lack of prejudice from the State. *Stops*, ¶ 41; *Ariegwe*, ¶ 123.

¶53    We agree with the District Court that Redlich failed to present sufficient evidence to establish that the delay in bringing him to trial caused undue prolonged disruption of his life and aggravated anxiety or concern beyond what any person accused of a crime would suffer. *See State v. Steigelman*, 2013 MT 153, ¶ 25, 370 Mont. 352, 302 P.3d 396. Redlich was incarcerated for 46 days prior to trial, and was subject to the conditions of

21

pretrial release for the remainder of the time prior to trial. He argued that this compromised his ability to present his defense because witnesses relocated, changed their phone numbers, and their memories faded. Redlich also noted that victims were uncooperative, which was prejudicial. However, Redlich presents no evidence to support these claims—he does not provide any details as to how exactly the delay hindered his defense. Additionally, the District Court noted that Redlich's 46 days of pretrial incarceration were due to Redlich's own repeated bond violations. The fact that Redlich's incarceration was due in part to his own inability to comply with the conditions of his release weighs against a finding of oppressiveness. Therefore, the District Court ultimately concluded that there was no prejudice to Redlich from the delay in this case.

### 5. Balancing the Four Factors

¶54 Finally, we determine whether Redlich was deprived of his right to a speedy trial in light of the facts of the case and the weight assigned to each of the four factors discussed above. *Morrisey*, ¶ 73. "None of the factors is dispositive by itself; rather, the factors are related and must be considered together with such other circumstances as may be relevant." *Ariegwe*, ¶ 153. Moreover, each factor's significance depends on the unique facts and circumstances of the case. *Ariegwe*, ¶ 105; *Morrisey*, ¶ 73. Here, on balance the District Court found that the State had overcome any presumption of prejudice to Redlich arising from the "moderately significant" length of the delay. Additionally, the District Court found no evidence of bad-faith delay tactics on the part of the prosecution.

22

¶55 Exercising de novo review of the constitutional question of whether Redlich's right to a speedy trial was violated, we agree with the District Court's conclusions and affirm its denial of Redlich's motion to dismiss. The District Court's conclusions correctly interpret the four-factor analysis required to evaluate a claim of lack of a speedy trial. *Ariegwe*, ¶ 34. Further, the District Court's findings of fact are supported by the evidence, and are not clearly erroneous.

## CONCLUSION

¶56 For the foregoing reasons, we affirm the District Court.


/S/ LAURIE McKINNON


We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT